587 F.2d 1176
 98 L.R.R.M. (BNA) 3186, 190 U.S.App.D.C. 279,
84 Lab.Cas. P 10,726
 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL NO.
310, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
United Steelworkers of America, Intervenor.
 No. 76-2065.
 United States Court of Appeals,
District of Columbia Circuit.
 
 Argued 19 Jan. 1978.
Decided 1 Aug. 1978.
 Benjamin W. Hilley, Great Falls, Mont., with whom Emilie Loring, Great Falls, Mont., was on the brief, for petitioner.
 Charles P. Donnelly, Atty., N. L. R. B., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of the Court with whom Leon S. Gottlieb, Beverly Hills, Cal., and Allen J. Kwawer, Encino, Cal., John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., were on the brief, for respondent.
 Before ROBINSON, ROBB and WILKEY, Circuit Judges.
 Opinion for the Court filed by WILKEY, Circuit Judge.
 Opinion filed by ROBB, Circuit Judge, dissenting in part.
 WILKEY, Circuit Judge:
 
 
 1
 Teamsters Local 310 petitions for review of an order of the National Labor Relations Board (NLRB) dismissing an unfair labor practice complaint. The complaint charged that three AFL-CIO unions, as members of a joint representative, breached their duty of fair representation to members of the Teamsters, in violation of § 8(b)(1)(A) of the Labor Act;[1] and that those unions attempted to cause the employer to discipline or discharge members of the Teamsters, in violation of § 8(b)(1)(A) and (b)(2) of the Act.[2] The Administrative Law Judge (ALJ) upheld these charges, but was reversed by the Board.[3] We believe that the Board's order is not supported by substantial evidence, and we accordingly remand for findings of fact and conclusions of law consistent with the evidence in the record as a whole.
 
 I. BACKGROUND
 A. FACTS
 
 2
 The facts, essentially undisputed, are elaborated in the decisions below and can be recapitulated briefly here. Since 1968 unions representing employees in the nonferrous mining industry have engaged in nationwide coordinated bargaining. This coordination is effected through a National Conference, a coalition of 26 unions which delegates to a Steering Committee the responsibility for setting minimum bargaining goals as guidelines for negotiations with industry employers. Before concluding a collective bargaining agreement, local negotiating committees must submit contract proposals to the Steering Committee for approval.
 
 
 3
 The employer in this case is Duval Corp., a copper company, which engages in collective bargaining on a single-employer basis. Negotiations on behalf of Duval's workers are conducted by a negotiating committee comprised of representatives from four unions: the Steelworkers, Laborers, Operating Engineers (collectively, the AFL-CIO unions), and the Teamsters. As is the pattern in the nonferrous mining industry, these four unions have been jointly certified as the exclusive bargaining agent at Duval's properties; the joint representatives thus function as "the union" in negotiating and signing collective-bargaining contracts. Dissension between the AFL-CIO unions and the Teamsters has existed for years and forms the backdrop of the negotiations at issue here. This dissension manifested itself in discourtesies at the bargaining table and violence in the field, in "raids" by one union on the membership lists of others, and in the filing of representation petitions designed to secure replacement of a given union by its rival.
 
 
 4
 In August 1974 Duval and the joint representatives commenced bargaining to replace the contract that was to expire 30 September 1974. In an apparent effort to insulate itself from the uncertainty attending the interunion rivalry, Duval at the outset informed all four unions of the company's understanding that negotiations would continue on a joint basis, and that "once the Spokesman for the Union(s) informs the Company that a new Collective Bargaining Agreement has been accepted . . . a new agreement exists."[4] The ALJ found on undisputed testimony that Duval reiterated this position during the course of negotiations and that the unions agreed.[5] The spokesman for the union negotiating committee was a member of the Steelworkers.
 
 
 5
 Joint negotiations continued amid increasing acrimony through 1 October; several issues were resolved, but Duval's wage offer still fell short of the Steering Committee's guideline. The negotiations recessed that evening so that the Teamsters' membership could vote on extending the old contract further; the Teamsters met separately, as they had done on previous occasions, in order to avoid a hostile confrontation and possible violence. At this meeting, the Teamsters voted 213-42 to reject additional contract extensions and to strike; they apprised the AFL-CIO unions of their vote and set up picket lines.
 
 
 6
 Later that evening negotiations resumed between Duval and representatives of the AFL-CIO unions, at which time the company raised its wage offer to meet the Steering Committee's guideline. The Teamsters' representatives did not attend this session; there was a dispute, unresolved by the ALJ, as to whether they were informed of it.
 
 
 7
 On the morning and evening of 2 October the AFL-CIO unions held membership ratification meetings to consider Duval's contract proposals. Members of the Teamsters and their representatives were refused admission to these meetings. Duval's latest concessions were conveyed to the AFL-CIO employees at the evening session, and they voted 474-110 to accept the contract. The spokesman for the negotiating committee called the Teamsters' representative, informing him that there was a contract and that the Teamsters' pickets were "illegal"; called the Steering Committee and received authorization to accept the contract, and notified the company that "they had a collective-bargaining agreement."[6] The ALJ and the Board both found that, under the terms of the union-company understanding, a contract thereupon came into being.[7]
 
 
 8
 On 3 October the Teamsters' representatives and picket captains were told repeatedly by AFL-CIO and company officials that a contract was in effect and that the pickets were illegal. The Teamsters replied that they had not yet ratified the contract, that their ratification meeting could not be scheduled until that evening owing to the difficulty of reassembling workers dispersed by the strike, and that the pickets would not be removed until ratification had occurred. The Teamsters ratified the contract that evening and took down the picket lines.
 
 
 9
 On the afternoon of 3 October representatives of the company met with representatives of the AFL-CIO unions to negotiate a strike-settlement ("back-to-work") agreement. The Teamsters were not notified of this meeting,[8] and no Teamsters attended it. The spokesman for the negotiating committee (who, as noted above, was a member of the Steelworkers) proposed,[9] and the company accepted, a provision under which Duval agreed not to commence any legal action against the AFL-CIO unions, but reserved the right "to seek redress against any individual union" and "to discharge or discipline any employee" who continued to picket or to sanction a strike or picket against the company "after 9:30 p. m. on October 2, 1974," in violation of the new contract's no-strike clause.[10]
 
 
 10
 On 4 October 1974 Duval discharged two Teamsters employees and disciplined a third for picketing on 2 and 3 October in violation of the no-strike clause. These workers had been warned, directly or indirectly, that their picketing was illegal because the new contract was in effect. The ALJ found that the discharged employees had been aggressive in processing grievances, active in implementing the Teamsters' program of soliciting members from the ranks of the AFL-CIO unions, and vocal exponents of the Teamsters' demands in collective-bargaining negotiations.[11] The ALJ also found considerable evidence of employer hostility to these workers.[12] Efforts to reinstate the workers failed, and the Teamsters filed charges with the Board.
 
 B. Course of the Litigation
 
 11
 The ALJ found that the AFL-CIO unions had breached their duty of fair representation to the Teamsters, in violation of § 8(b)(1)(A), by accepting the collective-bargaining contract before the Teamsters had had an opportunity to ratify it. The ALJ found that these unions had likewise breached their duty of fair representation to the Teamsters, in violation of § 8(b)(1)(A), and had attempted to cause the employer to discharge or discipline Teamsters employees, in violation of § 8(b)(2), by negotiating a strike-settlement agreement which made Teamsters liable to discharge for picketing at a time when they could not be expected to know that a contract containing a no-strike clause had been concluded. The ALJ recommended that the AFL-CIO unions be ordered to cease and desist from unfair labor practices, and, finding that their breach of duty had directly contributed to the disciplined workers' loss of employment, recommended that they be ordered to make those workers whole for any loss of pay they had suffered. The Board, reversing the ALJ, drew different inferences from the facts, found no violations of the Act, and dismissed the complaint.
 
 II. ANALYSIS
 
 12
 We review the Board's order to determine whether its findings are " supported by substantial evidence on the record considered as a whole."[13] The findings and decision of the Administrative Law Judge form an important part of the "record" on which this judgment of substantiality is to be based.[14] Under the statute, of course, the ultimate factfinder is the Board, and courts appropriately defer to "the presumptively broader gauge and experience of (its) members."[15] But while the Board is free to draw different inferences from the facts found by the ALJ, its inferences "should also rest upon some findings;" the Board must not "merely (state) that it disagrees,"[16] but must "set forth the basis of (its) disagreement with the ALJ so that we may determine whether the Board's finding is supported by substantial evidence in the record as a whole."[17]
 
 A. Duty of Fair Representation
 
 13
 The principles of labor law that frame our decision are well established, and the parties do not disagree as to them. A union has the duty, derived from its status as certified exclusive bargaining agent under § 9(a),[18] to represent all employees in the unit fairly.[19] This duty governs the union's behavior in all phases of the collective-bargaining process, from the negotiation and acceptance of collective agreements to their enforcement through the processing of grievances.[20] Breach of the duty of fair representation violates § 8(b) (1)(A), for it tends to encourage workers to join, or discourage them from joining, certain unions, thus restraining them in the free exercise of their § 7 rights.[21] In order to constitute an unfair labor practice, a union's conduct must be more than merely negligent; it must be "arbitrary, discriminatory, or in bad faith,"[22] or be based on considerations that are "irrelevant, invidious, or unfair."[23]
 
 
 14
 The AFL-CIO unions in this case were jointly certified with the Teamsters as the exclusive bargaining agent for Duval's employees. Since an exclusive representative owes a duty of fair representation to All workers in the unit, not merely to its own union members,[24] there can be no doubt, and the Board does not deny, that the AFL-CIO unions owed a general duty of fair representation to the Teamsters employees here. The Board, however, does deny that these unions breached their duty in either of the respects found by the ALJ: the ratification of the contract and the negotiation of the strike-settlement agreement.[25] We discuss these issues in turn.
 
 
 15
 1. The Ratification Procedures. The Labor Act does not require a union to accord its rank-and-file members the right to ratify a collective-bargaining contract which it has negotiated. The ALJ reasoned, however, that once a certified representative has determined to gain membership approval before it accepts a contract, it must accord the opportunity to vote equally to all unit members. This reasoning, we think, is sound. By denying a group of workers the chance to ratify, the union risks subjecting them to the disadvantages of a contract whose acceptance they could have prevented, and risks depriving them of the benefits of a contract whose acceptance they could have ensured. By discriminating against a group of workers in this way, a union plainly fails to represent them fairly "in respect to (their) rates of pay, wages, hours . . . , or other conditions of employment"[26] over the coming contract term. In this case the ALJ found that the AFL-CIO unions accepted the new contract on the basis of the ratification vote of their own members, at a time when the Teamsters had not ratified and under circumstances in which they could not ratify until the next day. Finding the action of these unions arbitrary and evidencing hostile discrimination, the ALJ concluded that a violation of the duty of fair representation had been established.
 
 
 16
 The Board, while nowhere denying that the AFL-CIO unions' conduct was arbitrary, discriminatory, or in bad faith, seeks to rationalize its rejection of the ALJ's conclusion on two grounds. It argues, first, that the Teamsters In effect were given an opportunity to ratify the contract when they voted on 1 October; and second, that the AFL-CIO unions owed the Teamsters no duty of fair representation with respect to contract ratification, since ratification was "entirely an internal union affair," a mere "advisory" vote with "no effect on the terms and conditions of Teamster employment."[27] These arguments rest on questionable logic, derive no evidentiary support from the record, and must be rejected.
 
 
 17
 First, the Board reasons that the Teamsters 1 October ballot, in which they voted 213-42 to reject Duval's then-current proposals and to strike, can be added to the AFL-CIO unions' 2 October ballot, in which they voted 474-110 to accept Duval's final offer, thus producing an overall vote of 516-323 to accept the contract.[28] This argument is illogical, both in qualitative and in quantitative terms. The Teamsters on 1 October did not vote on the final offer that became the contract; they voted to reject further extensions of the old contract and to strike, at a time when Duval had not made its final offer and when its wage proposal was not even up to the Steering Committee's guideline. The two votes, in short, were on different things, and to add them together, as the ALJ said, is to "add apples and oranges."[29] Quantitatively, the Board's argument fares no better. There is no reason to believe that the same number of Teamsters would have voted on 2 October as voted on 1 October, or that the outcome of their vote would have been the same. There were 425 Teamsters in the bargaining unit, more than enough to have defeated the contract's ratification, and the Board's speculations as to what the Teamsters' vote might have been[30] are without evidentiary support. The AFL-CIO unions' refusal to let the Teamsters vote on the contract cannot be justified by speculating that their vote would not have mattered.
 
 
 18
 The Board's second argument, that the AFL-CIO unions owed the Teamsters no duty of fair representation with respect to contract ratification because ratification was "entirely an internal union affair," is no more convincing than the first. As a general proposition, it is true that a union only breaches its duty of fair representation when it discriminates against employees "in matters affecting their employment."[31] This is because a union's duty of fair representation derives from its status as exclusive bargaining representative under § 9(a); a union, therefore, can be held to represent employees Unfairly only in regard to those matters as to which it represents them At all namely, "rates of pay, wages, hours . . ., or other conditions of employment."[32] Notwithstanding the correctness of its premise, however, the Board's argument that depriving the Teamsters of the opportunity to vote on a contract that would govern them for the next three years had "no effect on the terms and conditions of (their) employment" is preposterous.
 
 
 19
 The Board starts with the proposition that, under the terms of the union-company understanding, a collective-bargaining contract would be held to come into being when the spokesman for the negotiating committee communicated its acceptance to Duval. From this, the Board concludes that membership ratification was merely "advisory" and thus was not "necessary" to contract acceptance. This may be correct as to the Duval-union relationship, but not as to the inter-union arrangement. For to say that, as between Duval and the unions, a contract came into being on 2 October (and we accept the findings of the ALJ and the Board that it did) is not to say that, as between the AFL-CIO unions and the Teamsters, the spokesman acted Properly in communicating acceptance before the Teamsters had ratified.
 
 
 20
 The Teamsters' ratification may not have been "necessary" in the sense that its absence rendered the contractual acceptance void; but this does not mean that their ratification was not "necessary" in the sense that the AFL-CIO unions properly had to get it first. All the evidence in the record indicates that membership ratification Was necessary in the latter sense. The undisputed evidence revealed that All previous contracts at Duval had been submitted for membership ratification prior to acceptance.[33] The constitutions of three of the constituent unions (Laborers, Operating Engineers, and Teamsters) Required membership ratification prior to acceptance.[34] Most importantly, the AFL-CIO unions themselves acted in accordance with the belief that ratification was required prior to acceptance, since the spokesman did not communicate acceptance of the contract to Duval until immediately After the AFL-CIO members' votes had been counted.[35]
 
 
 21
 For these reasons, we conclude that the AFL-CIO unions did in fact deny the Teamsters the opportunity to ratify the collective-bargaining contract,[36] and that in so doing those unions discriminated against the Teamsters "in matters affecting their employment." We accordingly hold that the Board's order dismissing this aspect of the complaint is unsupported by substantial evidence.
 
 
 22
 2. The Strike-Settlement Agreement. The ALJ found that the AFL-CIO unions breached their duty of fair representation to the Teamsters by negotiating a strike-settlement agreement that subjected Teamsters employees to discharge for picketing at a time when they could not be expected to know that a new contract containing a no-strike clause had been concluded. As noted above, the strike-settlement agreement made Duval employees liable to discharge for picketing after 9:30 p. m. on 2 October. The evidence is in dispute as to when the new contract came into being. The company representative testified that the spokesman called him to accept the contract at 9:30 p. m. on 2 October; the spokesman himself placed the time of notification at 11:00 p. m.[37] At best, then, the strike settlement agreement made employees liable to discharge at the moment of the contract's acceptance, when Teamsters on the picket lines could not possibly have known that a contract existed; at worst, the strike settlement agreement subjected the Teamsters to Retroactive liability for picketing 1 1/2 hours Before the contract came into being. The ALJ, resolving credibility questions, found that the AFL-CIO unions had not even notified the Teamsters of the strike-settlement meeting.[38] Again making credibility resolutions, the ALJ found that the spokesman (a member of the Steelworkers) not only had accepted, but actually had proposed, the language detrimental to the Teamsters.[39] Finding ample evidence of AFL-CIO animus toward the Teamsters, the ALJ concluded that negotiation of the strike-settlement agreement constituted a breach of their duty of fair representation.
 
 
 23
 The Board, while explicitly accepting all of the ALJ's credibility findings,[40] rejected this conclusion. In its decision, the Board made no findings and gave no reason for doing so. In its brief, the Board argues that the Teamsters employees were not disciplined because of the strike settlement agreement, but for picketing in violation of a no-strike clause in a valid contract; and that they were not disciplined unknowingly, but after repeated warnings that a contract existed and that their picketing was in consequence illegal.[41] Whatever the merit of these arguments, they are irrelevant to the issue here. The causes and the rightfulness of the actual discharges on 4 October have nothing to do with the propriety of the AFL-CIO unions' action the day before. The ALJ found that those unions deliberately and unfairly subjected Teamsters employees to an unreasonable risk of discharge for unknowing conduct. Whether this risk was realized in precisely the way the AFL-CIO unions envisioned is immaterial in deciding whether they breached their duty of fair representation in creating it. We accordingly hold that the Board's order dismissing this aspect of the complaint was unsupported by substantial evidence.
 
 
 24
 B. Attempt to Cause Discharge of Employees. A union violates § 8(b)(2) when, for arbitrary, irrelevant, or invidious reasons it causes or attempts to cause the employer to discriminate against an employee in regard to hire, tenure, or condition of employment. The ALJ found that the AFL-CIO unions, by negotiating the strike-settlement agreement as described above, attempted to cause Duval to discharge picketing Teamsters employees because they were part of a dissident group.[42] The ALJ further found that the AFL-CIO unions' conduct directly contributed to the disciplined employees' loss of employment, and recommended that they be made whole. The Board, having found no breach of the duty of fair representation in violation of § 8(b)(1)(A), likewise found no attempt to cause discharge in violation of § 8(b)(2),[43] and concluded that the discharges owed, not to the unions' conduct, but to the employer's independent decision to discharge workers who were violating a no-strike clause in a valid contract.
 
 
 25
 In view of the sparseness of the record on this issue, we express no view on the merits of the (b)(2) claim or on the appropriateness of the ALJ's proposed remedy. On remand, the Board will have to reconsider its conclusion that the AFL-CIO unions did not breach their duty of fair representation in negotiating the strike-settlement agreement. If it concludes that the duty was breached, the Board should consider whether that breach Per se constitutes a violation of § 8(b)(2) or whether more evidence of an attempt to cause discharge is necessary. If the Board finds a violation of § 8(b)(2), it should consider whether that violation was causally related to the disciplining of the three Teamsters employees, giving appropriate weight to the ALJ's findings of union and employer hostility towards them. In this connection the Board should also consider the relevance of the General Counsel's determination that Duval, in firing the workers, did not discriminate against them in regard to tenure of employment in violation of § 8(a)(3).
 
 
 26
 Remanded for proceedings consistent with this opinion.
 
 ROBB, Circuit Judge, dissenting in part:
 
 27
 I think the Board's conclusions regarding the ratification procedure were consistent with the Administrative Law Judge's findings and supported by substantial evidence. Therefore those conclusions cannot be disturbed on the basis of the contentions urged by petitioner Teamsters. Accordingly, I dissent from that part of the majority's opinion reversing the Board's holding that the AFL-CIO unions did not breach their duty of fair representation in the conduct of the contract ratification.
 
 
 28
 The ALJ ruled that the AFL-CIO unions breached their duty by denying the Teamsters the same opportunity to vote on contract ratification as was accorded to the other employees. 226 N.L.R.B. 785. The ALJ said that a union was not required to permit employees to vote on a proposed contract, but that once the right to vote was granted it must be extended to all evenly. The Teamsters' opportunity to vote on the offer outstanding on October 1 was not, according to the ALJ, an adequate substitute for the opportunity to vote on the final offer because the later offer contained additional employer concessions. Id. As a corollary to this ruling, the ALJ found that the AFL-CIO unions further breached their duty by accepting the contract before the Teamsters had voted on the final order. 226 N.L.R.B. 786.
 
 
 29
 The Board disagreed. It concluded that if the Teamsters had no opportunity to vote on the final offer, it was due to the union's "go(ing) its own way" and calling a strike. 226 N.L.R.B. 774. The Board also noted that the AFL-CIO unions had considered the ratification vote by the Teamsters on October 1 in determining that a majority of employees favored the final offer. Id. The Teamsters had voted 213 to 42 to reject the proposal before them on October 1. Id. The Board found that when added to the AFL-CIO votes cast on October 2, the Teamsters vote showed that 516 employees favored accepting the contract while 323 would reject it. Id. The Board therefore believed that a second Teamsters vote would not have changed the outcome. Id.
 
 
 30
 The Board's principal ground for its reversal of the ALJ that any lack of an opportunity by the Teamsters to vote on the final offer was due to the union's decision to strike is contrary to neither the ALJ's findings nor the evidence. The Board merely concluded as a matter of law that the Teamsters must be held accountable for their unilateral action of withdrawing and striking. This conclusion is supported by the evidence and by the ALJ's findings, and justifies affirmance of the Board's holding. The ALJ found that the Teamsters' business representative received a copy of the final offer on the afternoon of October 2 when it was delivered to the other unions, and that the business representative notified Duval that the Teamsters would be unable to vote on the offer that day because they were not working. 226 N.L.R.B. 780. Thus, the Teamsters were accorded the same opportunity as the other employees to vote on October 2 on the final offer; because they were out on strike, however, the Teamsters did not vote that day.
 
 
 31
 Nor was the alternate ground for the Board's conclusion contrary to the evidence. The Board concluded that in light of the results from the AFL-CIO union's vote on October 2 and the Teamsters' vote on October 1, a second Teamsters vote would not have affected the outcome. This conclusion is not contrary to any factual finding by the ALJ. Moreover contrary to the majority's assertion, I think the Board could rely on the Teamsters vote on October 1 as at least indicative of how the Teamsters would have voted on the offer, which proposed greater union benefits than the earlier offer. The company had added to its final offer a wage increase plus several concessions for which the union negotiators had fought hard. Further, the final offer included a union demand apparently benefiting only the Teamsters: installation of air conditioning on haulage trucks. 226 N.L.R.B. 780. Installation of the air conditioning was a Teamsters' demand that had been withdrawn from bargaining by a majority vote of the union negotiating committee. 226 N.L.R.B. 779. However, because of the Teamsters' direct appeal to Duval, coupled with the union's threat to thwart conclusion of an agreement, Duval agreed to install air conditioning in the trucks. 226 N.L.R.B. 779. Accordingly, the Board's conclusion that at least an equal number of Teamsters would have voted to accept the more attractive final offer was reasonably derived from the evidence.
 
 
 32
 The Board's reversal thus was not predicated on any finding contrary to those of the ALJ and it was fully supported by the record. Moreover, the Board's conclusion that the AFL-CIO unions had not discriminated against members of the Teamsters on the basis of any unfair, arbitrary, irrelevant, or invidious distinctions was reasonable. Like the members of the other unions, the Teamsters had the opportunity on October 2 to vote on the final offer. The Board's conclusion that they forsook it by going on strike was reasonable. Further, the Board acted reasonably in taking into account the earlier vote by the Teamsters. The majority has substituted its conclusion from the evidence for the expert judgments of the Board. This a court cannot do. NLRB v. Bridge Workers Local 103, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978); See 29 U.S.C. § 160.
 
 
 
 [1]
 NLRA § 8(b)(1)(A), 29 U.S.C. § 158(b)(1)(A) (1970):
 (b) It shall be an unfair labor practice for a labor organization or its agents
 (1) to restrain or coerce (A) employees in the exercise of the rights (to organize and bargain collectively) guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . ..
 
 
 [2]
 NLRA § 8(b)(2), 29 U.S.C. § 158(b)(2) (1970):
 (b) It shall be an unfair labor practice for a labor organization or its agents
 (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section . . ..
 NLRA § 8(a)(3), 29 U.S.C. § 158(a)(3) (1970), prohibits an employer from encouraging or discouraging membership in any labor organization "by discrimination in regard to hire or tenure of employment or any term or condition of employment. . . ."
 
 
 [3]
 The ALJ's decision is printed at 226 N.L.R.B. 775 (1976). The Board's decision and order is printed in Id. at 772, 94 L.R.R.M. 1239 (1976)
 
 
 [4]
 226 N.L.R.B. at 779
 
 
 [5]
 Id. The Board made the same finding, Id. at 77 , 94 L.R.R.M. at 1240:
 Duval's attorney . . . sent a letter to the various members of the joint representatives stating, in part, that, once the spokesman for the unions had informed the Company that a collective-bargaining agreement had been accepted, a new agreement existed. Although the unions did not reply to (this) letter, (the Duval Representative's) uncontroverted testimony was that this position was restated during the course of the negotiations and agreed to by the unions.
 
 
 [6]
 226 N.L.R.B. at 781
 
 
 [7]
 Id. at 786; Id. at 775, 94 L.R.R.M. at 1242
 
 
 [8]
 226 N.L.R.B. at 786 & n. 29. See id. at 772 n. 1
 
 
 [9]
 Id. at 781
 
 
 [10]
 Id. The contract agreed to on the evening of 2 October contained the following provision, Id. at 782:
 Section 2. No strike.
 (1) The Union agrees that during the life of this Agreement there shall be no strike, work stoppage, or slowdown called, authorized, approved, or sanctioned by the Union.
 (2) Any employee who actively participates in, supports, or encourages any such strike, work stoppage, or slowdown shall be subject to discipline or discharge by the Company with right of appeal to the Grievance Procedure only as to the determination of the question of whether the employee so disciplined or discharged did actively participate in, support, or encourage such strike, work stoppage, or slowdown.
 
 
 [11]
 Id. at 782
 
 
 [12]
 Id. at 782, 783
 
 
 [13]
 NLRA § 10(f), 29 U.S.C. § 160(f) (1970)
 
 
 [14]
 Universal Camera Corp. v. NLRB, 340 U.S. 474, 492-97, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 395, 444 F.2d 841, 853 (1970) (Leventhal, J.)
 
 
 [15]
 Oil Workers Local 4-243 v. NLRB, 124 U.S.App.D.C. 113, 116, 362 F.2d 943, 946 (1966) (Leventhal, J.)
 
 
 [16]
 Retail Store Employees Local 400 v. NLRB, 123 U.S.App.D.C. 360, 362, 360 F.2d 494, 496 (1965) (Fahy, J.)
 
 
 [17]
 Local 441, IBEW v. NLRB, 167 U.S.App.D.C. 53, 55, 510 F.2d 1274, 1276 (1975) (Leventhal, J.)
 
 
 [18]
 29 U.S.C. § 159(a) (1970):
 Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . .
 
 
 [19]
 Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Humphrey v. Moore, 375 U.S. 335, 349-50, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964)
 
 
 [20]
 See C. J. Morris, The Developing Labor Law 743-44 (1971) (citing authorities)
 
 
 [21]
 See, e. g., Kesner v. NLRB, 532 F.2d 1169, 1174 (7th Cir.), Cert. denied, 429 U.S. 983 & 1022, 97 S.Ct. 499 (1976); Truck Drivers Local 568 v. NLRB, 126 U.S.App.D.C. 360, 367-368, 379 F.2d 137, 144-45 (1967); Local 12, United Rubber Workers v. NLRB, 368 F.2d 12, 17 (5th Cir. 1966), Cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967); Miranda Fuel Co., Inc., 140 N.L.R.B. 181, 51 L.R.R.M. 1584 (1962), Enforcement denied, 326 F.2d 172 (2d Cir. 1963). A union's breach of its duty of fair representation also gives the aggrieved employee a right of action in state court, or in federal court under 28 U.S.C. § 1337 (1970) or LMRA § 301, 29 U.S.C. § 185 (1970). See Vaca v. Sipes, 386 U.S. 171, 179-80, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); T. Kheel, 6 Labor Law § 28.03(2a) (1974); C. J., Morris, Supra note 20 at 739
 
 
 [22]
 Vaca v. Sipes, 386 U.S. at 190, 87 S.Ct. at 916
 
 
 [23]
 Miranda Fuel Co., Inc., 140 N.L.R.B. at 185, 51 L.R.R.M. at 1586
 
 
 [24]
 E. g., Wallace Corp. v. NLRB, 323 U.S. 248, 255, 65 S.Ct. 238, 89 L.Ed. 216 (1944)
 
 
 [25]
 The Board also rejected the ALJ's conclusion that the AFL-CIO unions breached their duty of fair representation by denying the Teamsters' business representatives access to the 2 October membership ratification meetings. See p. --- of 190 U.S.App.D.C., p. 1179 of 587 F.2d Supra. We see no reason to disturb the Board's order in this respect
 
 
 [26]
 NLRA § 9(a), 29 U.S.C. § 159(a) (1970)
 
 
 [27]
 Brief of NLRB at 17, 18
 
 
 [28]
 The Board states in its decision that the spokesman for the AFL-CIO unions actually Made this calculation, out of deference to the Teamsters, before communicating acceptance of the contract to Duval. See 226 N.L.R.B. at 773, 94 L.R.R.M. at 1241. The ALJ, however, made no such finding, and the testimony on this subject was ambiguous. See J.A. 254-55
 
 
 [29]
 226 N.L.R.B. at 785
 
 
 [30]
 Speculation about the possible results of a new vote by the Teamsters simply cannot, in any event, operate to neutralize the AFL-CIO unions' omission in the circumstances of this case. Though the final contract offer was more favorable to the Teamsters than the proposal of 1 October, the Teamsters who voted to accept the initial offer might well have been encouraged by Duval's concessions to press for further gains instead of ratifying the new proposal as it was. That being so, it was incumbent on the AFL-CIO unions to afford the Teamsters an opportunity to cast their ballots on the offer of 2 October. Thus, even were it reasonable to conclude that the Teamsters favoring the first offer would have voted similarly with respect to the second a prophecy we decline to endorse the substantial risk of the contrary result made necessary a second vote by the Teamsters. And it was untoward for the AFL-CIO unions to deny them that privilege while extending it to the AFL-CIO membership. The dissent misses this fundamental point in urging that the Board's prediction of a particular outcome had some support in the evidence. See diss. op. at --- - --- of 190 U.S.App.D.C., at 1186-1187 of 587 F.2d
 
 
 [31]
 Miranda Fuel Co., Inc., 140 N.L.R.B. at 185, 51 L.R.R.M. at 1586. See Retana v. Apartment Operators Union Local 14, 453 F.2d 1018, 1024 (9th Cir. 1972). ("It is no answer to say that the complaint relates to appellee union's 'internal' policies and practices. . . . As a practical matter, intra-union conduct could not be wholly excluded from the duty of fair representation, for . . . internal union policies and practices may have a substantial impact upon the external relationships of members of the unit to their employer.")
 
 
 [32]
 NLRA § 9(a), 29 U.S.C. § 159(a) (1970)
 
 
 [33]
 See 226 N.L.R.B. at 785; J.A. at 476
 
 
 [34]
 See J.A. at 473
 
 
 [35]
 The only evidence the Board cites for the proposition that membership ratification was "irrelevant" to contract acceptance is "the fact that earlier in 1974, the Steering Committee compelled negotiators to reject a contract at Anamax (an industry employer) despite membership ratification." Brief of NLRB at 20 n. 7. In the Anamax situation, the Steering Committee refused to approve a proposed contract because it provided for a wage increase below the Steering Committee's guideline. See pp. --- - --- of 190 U.S.App.D.C., pp. 1178-1179 of 587 F.2d Supra. Yet the fact that the Committee could compel Rejection of a contract that the membership had Accepted does not demonstrate that it could compel Acceptance of a contract that the membership had Rejected. As noted in the text, the practice at Duval was precisely the contrary
 
 
 [36]
 The dissent argues that "the Teamsters Were accorded the same opportunity as the other employees to vote on October 2 on the final offer;" it was only because the Teamsters "were out on strike (that they) did not vote that day." Diss. op. at --- of ---- U.S.App.D.C., at 1186 of 587 F.2d (emphasis added). This argument, we think, is somewhat formalistic. The AFL-CIO unions knew full well that the Teamsters employees had been dispersed by the strike and could not be assembled for a vote until 3 October. Any "opportunity" the Teamsters were given to vote on 2 October, therefore, was utterly meaningless. If the AFL-CIO unions really were representing the Teamsters fairly, they would not have accorded them such a spectral opportunity to exercise their rights. Nor do we think that the AFL-CIO unions' conduct can be rationalized on the theory that the Teamsters "forfeited" their right to vote by going on strike. See diss. op. at --- of 190 U.S.App.D.C., at 1186 of 587 F.2d. Judge Robb does not deny that the Teamsters had the right under § 7 to strike after their contract had expired. Judge Robb seems to agree that the Teamsters, on the facts of this case, also had the right to an equal vote on the collective-bargaining contract. To suggest that the Teamsters, by exercising their first right, should be held to have forfeited the second, is to pose a dilemma quite foreign to the spirit of our labor law. The dilemma, in any event, is particularly obnoxious here because it was Created by the AFL-CIO unions. If they had simply waited until After the Teamsters had voted no one would have had to "forfeit" any rights at all
 
 
 [37]
 226 N.L.R.B. at 780
 
 
 [38]
 Id. at 786 & n. 29
 
 
 [39]
 Id. at 786 & n. 28
 
 
 [40]
 Id. at 772 n. 1
 
 
 [41]
 Brief for NLRB at 23-25
 
 
 [42]
 226 N.L.R.B. at 786-87
 
 
 [43]
 Id. at 775, 94 L.R.R.M. at 1243