Stanley WHITE, Ulysses Brown, and Donald W. Swanson, Individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

WHITE ROSE FOOD, a Division of Digiorgio Corporation, Defendant.

No. CV 93–4837(ADS).

United States District Court, E.D. New York.

Oct. 28, 1999.

See also 62 F.Supp.2d 878.

Law Offices of Leonard M. Flamm, New York City (Leonard N. Flamm, Norman Mednick, of Counsel), for Plaintiffs.

Grotta, Glassman & Hoffman, P.A., Roseland, NJ (Jedd Mendelson, Jed L. Marcus, Patricia L. Hardaway, of Counsel), for Defendant.

### MEMORANDUM AND ORDER

SPATT, District Judge.

This is an action brought pursuant to Section 301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185, arising from the disbursement of settlement funds following a plant closing. This case has been the subject of a number of prior decisions, resulting in a Second Circuit opinion on October 22, 1997, which set the "rules of the road" for the final determination of this lawsuit. *See White v. White Rose Foods,* 128 F.3d 110 (2d Cir.1997).

On appeal, the Second Circuit affirmed this Court's prior dismissal as against the Furniture, Flour, Grocery, Teamsters, Chauffeurs & Warehousemen Union, Local No. 138 ("Local 138"). However, the Second Circuit reversed this Court's dismissal of the third amended complaint against the plaintiffs' previous employer, the defendant White Rose Food, a division of Di-Giorgio's Corporation (the "defendant" or "White Rose"). *Id.* Subsequently, this Court dismissed the plaintiffs' tax counts

in a decision dated July 12, 1999. *White v. White Rose Food*, 62 F.Supp.2d 878 (E.D.N.Y.1999). As a result of the prior decisions, the only remaining cause of action in the third amended complaint is the Section 301 claim against White Rose, contained in the first cause of action.

## I. BACKGROUND

This action was commenced in August 1993 by the plaintiffs, former employees of White Rose and members of Local 138. The dispute centers on an agreement ("the Settlement Agreement") between White Rose and Local 138 that followed the closing of White Rose's Farmingdale, New York warehouse and a subsequent labor strike. Under the terms of the Settlement Agreement, eligible individuals could elect either (1) to receive payment from a strike settlement fund; (2) to receive pension contributions; (3) placement in preferential hiring lists at other White Rose facilities, for a period of time; or (4) immediate placement in a job at another facility.

The Settlement Agreement provided that White Rose would place the sum of $1,500,000 in two separate payments in a special escrow account to be distributed to eligible former employees of the Farmingdale facility. The Settlement Agreement contained a binding arbitration clause and expressly stated that it must be ratified by the eligible rank and file members of Local 138 who were former employees of White Rose. White Rose executed the Settlement Agreement on July 23, 1992 and the Union membership ratified it on September 21, 1992. Approximately 344 employees accepted the settlements monies while the other members of Local 138 selected one of the other options, described above.

In January 1993, the entity that was to act as escrow agent and distributor of the settlement funds determined that it was unable to function in that capacity. Subsequently, on January 23, 1993, Local 138 and White Rose entered into an "Amendment to Settlement Agreement," (the "Amendment"), that provided for payment directly from White Rose to the eligible employees, upon presentation of a list of those employees and their completed W–4 forms. The Amendment also provided for White Rose to issue payroll checks to those former employees who elected to receive the settlement funds. The Amendment further provided that from the settlement sum of $1,500,000, White Rose shall issue "payroll checks, less all required tax deductions." Pursuant to the Amendment, White Rose made deductions for all applicable employer payroll taxes from the checks that were issued. In this regard, the Amendment provided that:

> White Rose shall issue appropriate payroll checks, less all required tax deductions, for those former White Rose employees who elect to receive settlement money. The Company's contribution share for all federal, state and local payroll taxes, and F.I.C.A., shall be included in the $1,000,000.00 and $500,000.00 funds established in the Settlement Agreement. Accordingly, the settlement funds established by the Settlement Agreement which may go directly to former White Rose employees shall be reduced by the amount of such contributions.

The Amendment did not contain the language regarding membership ratification that was found in the original Settlement Agreement, and it was not presented to the rank and file for ratification. On February 11, 1993, White Rose delivered to the Union its first installment of the settlement funds. On September 23, 1993, White Rose delivered the second installment. Each of the 344 former employees who completed the withholding form received a total gross remuneration of $3,799.10. White Rose withheld Federal Unemployment Taxes ("FUTA"), State Unemployment Taxes ("SUI"), and Federal Insurance Taxes ("FICA") in the total mounts of $10,455, $82,677.67 and $99,-977.11, respectively, amounting to the total sum of $193,109.91, which was deducted by

White Rose from the $1,500,000 settlement sum.

At the crux of this case, the plaintiffs contend that the Settlement Agreement, the collective bargaining agreement and the Union Bylaws required that membership ratification be obtained with regard to the Amendment prior to the disbursement of the settlement funds that withheld the FUTA, FICA and SUI taxes. The plaintiffs contend that Local 138 and White Rose (1) wrongfully entered into an amendment to the settlement agreement that was not ratified by the rank and file; and (2) the Amendment permitted White Rose to wrongfully deduct the employer's share of payroll taxes in the sum of $193,-109.91 from the $1,500,000 settlement funds. On the other hand, the defendant's primary contention is that Local 138 did not violate its duty of fair representation in that it was not required to submit the amendment to the members for ratification.

## II. THE SECOND CIRCUIT DECISION OF OCTOBER 22, 1997

On appeal, the Second Circuit affirmed the Court's dismissal of the plaintiffs' claims against Local 138. The Court held that the plaintiffs' claim that Local 138 breached its duty of fair representation by entering into the Amendment without ratification by the union membership was "time-barred by the six-month limit of *DelCostello*," 128 F.3d at 114 (referring to *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 163–64, 103 S.Ct. 2281, 2289–91, 76 L.Ed.2d 476 [1983]). Similarly, the Second Circuit held that this Court's dismissal of the plaintiffs' claim that the union breached its duty of fair representation by refusing to take its claim to arbitration, was also "barred by the six-month limitations period of *DelCostello*." *Id.* at 115.

With regard to the Section 301 claim against White Rose, the Second Circuit held that:

[t]he fact that the plaintiffs are time-barred from bringing a claim against the union does not mean that the plaintiffs cannot prove that Local 138 breached its duty of fair representation in an action against White Rose.... [P]laintiffs suing under a § 301/DFR theory need not sue their union at all: it could hardly be that running of the limitations period as to the union extinguishes the right of action against the employer. The fact that *DelCostello's* limitation period has expired as against Local 138 has no bearing on the validity of the plaintiffs' suit against White Rose.

128 F.3d at 115–16.

The Second Circuit added, however, that "we express no view as to whether the union's failure to submit the amendment for ratification or to challenge the disbursements when made (absent a demand from the membership at the time) amounts to a breach of the duty of fair representation." *Id.* at 116.

In its decision of July 12, 1999, this Court denied the defendant's motion for summary judgment dismissing the plaintiffs' Section 301 cause of action. The Court held that there were material triable issues as to whether Local 138's conduct in entering into the Amendment permitting the employer to withhold the payroll taxes in the sum of $193,109.91 from the agreed upon settlement sum without ratification by the Local 138 membership, constituted the arbitrary, discriminatory or bad faith conduct required to establish a "fair representation" cause of action. 62 F.Supp.2d at 884–85.

In addition, the Court held that there were material triable issues with regard to the conduct of Local 138 when it failed to challenge the deduction made for employer payroll taxes, and, in fact, may have permitted it. *Id.* at 885–86 In addition, the Court raised another factual issue, namely, whether the Local 138 officer(s) who signed the Amendment, could reasonably believe that they had the authority to bind

the members without their ratification. *Id.* at 884–85.

### III. THE TRIAL—FINDINGS OF FACT

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) *See Rosen v. Siegel,* 106 F.3d 28, 32 (2d Cir. 1997); *Colonial Exchange Ltd. Partnership v. Continental Casualty Co.,* 923 F.2d 257 (2d Cir.1991). During this portion of the opinion, the Court will make findings of fact which will be supplemented by additional findings later in the opinion.

#### A. *The Plaintiffs' Case*

Stanley White, is a named plaintiff, and was a White Rose employee from 1965 to 1991. He was a member of Local 138 from 1966 until he retired in 1993. White was involved in the strike called by Local 138 in 1991. The strike lasted for 18 months and was settled in 1992. The Settlement Agreement (Plfs.Ex. 1) was signed by White Rose on July 23, 1992 and by Local 138 on September 15, 1992.

In July, 1992, the members of Local 138 were asked to ratify the Settlement Agreement at a union meeting called by John Georgopoulos, the Union President. There were more than 200 members at the meeting. At that time, every member was given a copy of the Settlement Agreement and White read it for the first time. At that meeting, the Union members voted to ratify the Settlement Agreement.

White first learned about the existence of the Amendment (Plfs.Ex. 2) from his lawyer:

Let me show you what I described as Plaintiffs' Exhibit 2 for Identification. (Handed to the witness.)

. . . . .

MR. MENDELSON: On the amendment?

MR. MEDNICK: Yes.

Q You see the date January 23, 1993?

A YES.

Q From January 23, 1993, to on or about April or May of 1993, did you know of the existence of this amendment?

A No.

Q Now, after January 23, 1993, which is the last date on this agreement, did anybody at Local 138 or White Rose tell you personally that White Rose and Local 138 had entered into the agreement you are holding the amendment you are holding?

A No.

Q Now, how did you learn for the first time that such an amendment to the settlement existed?

A I learned from my lawyer.

. . . . .

THE WITNESS: Yes. This second amendment I never heard of. I never heard about this. This one I don't know. I am talking about this one here (indicating). When he says amendment, I don't know nothing abut this, your Honor.

Tr. at 11–12, 39.*

With regard to the payroll tax deductions, the Amendment, a short two-page document, provides as follows:

. . . Upon receipt of the Union's notification *and the properly completed I.R.S. W–4 Form,* White Rose shall issue appropriate payroll checks, less all required tax deductions, for those former White Rose employees who elect to receive settlement money. The Company's contribution share for all federal, state and local payroll taxes, and F.I.C.A., shall be included in the $1,000,-000.00 and $500,000.00 funds established in the Settlement Agreement. Accordingly, the settlement funds established by the Settlement Agreement which may go directly to former White Rose

---

* Tr. refers to the trial transcript.

employees shall be reduced by that amount of such contributions.

(Emphasis in the original).

On January 20, 1993 at the request of President Georgopoulos, White signed a W-4 "Employee's Withholding Allowance Certificate" (Plfs.Ex. 3). At the time Georgopoulos gave White the W-4 form to sign, he did not tell him that he had signed the Amendment the day before, on January 19, 1993. When White received his settlement check he noticed a "double deduction" on the check stub. That is how he first learned about the payroll deduction made by White Rose. Despite this, White cashed his settlement checks. Other than this lawsuit, he never attempted to have the Union resolve the dispute, nor did he pursue arbitration.

White described the strife-filled strike period, in which he participated by picketing three times a week at the Farmingdale plant. After the strike was settled, White "felt beaten that I had lost my job ... I felt beaten in that respect" and he was "unhappy and dissatisfied with the company" and "angry." (Tr. at 29). Also, he conceded that the Union had been unable to stop White Rose from closing the Farmingdale plant and moving it to New Jersey. The Union sought to compel arbitration as to this dispute and was unable to do so. White believes that both the Union and White Rose "wronged him" with regard to the payroll deductions from his checks.

White conceded that over the course of his years as a member of Local 138, it represented him "pretty well" and prior to the events at issue, he was satisfied with the representation of President Georgopoulos.

Donald Swanson, another former employee of White Rose and a member of Local 138, told a similar story. He was employed from 1977 to 1991 as a driver and warehouseman. Swanson also voted to ratify the Settlement Agreement after President Georgopoulos gave him a copy at the meeting in 1992. He never knew of the existence of the Amendment until advised of it by his attorney in April or May 1993.

Swanson was given a W-4 form to sign by President Georgopoulos on January 20, 1993 (Plfs.Ex. 7). Significantly, as with White, even though Georgopoulos had signed the Amendment the day before, on January 19, 1993, he said nothing about it to Swanson. When Swanson got his check on February 11, 1993 and looked at the stub (Plfs.Ex. 8), he first found out about the deductions.

A crucial exhibit in this case is the Constitution and Bylaws of Local 138 (Plfs.Ex. 10). Swanson received a copy of this document, as did every Union member. He received it when he first became a member in 1977. It was provided to him by President Georgopoulos and Vice President Robert Skeries. Section 15.05 of the Constitution Bylaws of Local 138 provides as follows:

> Sec. 15.05 VOTING ON CONTRACT RATIFICATION AND STRIKE AUTHORIZATION. Contract ratification and strike authorization shall be made at meetings called specifically for those purposes and shall include only members covered by the contract unless the Executive Board shall determine that the matter is of such importance as to be submitted to the entire membership.

Swanson did not request that the Union arbitrate this matter. He stated "how are we going to go against them." In addition, Swanson received a copy of a letter from Vice President Skeries "stating everything was all right." This letter (Plfs.Ex. 4), addressed to Steven Glassman, Esq., counsel for White Rose, apparently contained a misrepresentation as to the content of the Local 138 bylaws. It stated, in pertinent part, the following:

> This will further advise you that it is the position of Local 138 that the Settlement Agreement and amendment thereto were concluded in compliance with the Union's By-Laws and are binding on

Local 138 and all former White Rose employees who were represented by Local 138.

To the contrary, the Court finds that the Amendment was not "concluded" in compliance with the Union's Bylaws, which, in Section 15.05, provide that "contract ratification ... shall be made at meetings called specifically for those purposes."

As a lay person, Swanson was permitted to voice his lay opinion in answer to the question as to the basis for his lawsuit.

Now what did the union do wrong?

THE WITNESS: First they made an agreement to reduce the money we were going to get. And they didn't even tell us about it.

I am not a tax lawyer, but they got to make some kind of bad moves or tax violations. And they proceeded to deal with White Rose, Local 138, to conceal this whole thing from the rank and file.

Q Mr. Swanson, do you believe that local had the authority to bind its members to the amendment?

A No.

Q Why not?

A Because on the platform that Georgeopoulos (sic) and Skerries (sic) ran, they promised us they wouldn't do like the old union delegates did in the past. They were ripping us off anyway, contracts, any kind of amendments, anything to do with money, it had to be strictly voted on by the rank and file, or it didn't pass.

Q Mr. Georgeopoulos (sic) told you that while he was campaigning for the presidency?

A Yes. I ran around and—with John Georgeopoulos (sic) when he was campaigning.

Q Mr. Swanson, please tell the Court what in your opinion you believed White Rose did wrong?

A They did the same thing, plus they were able to pocket 194 million—no, $194,000 and put it in their own pock-

et, and did the same thing. They did this so we wouldn't know about it. Tr. at 78–79.

Swanson admitted that when he received his check, even though he could not know the exact amount he was entitled to, he knew it was "short" and "they doubled up on my taxes." Also, he was "kind of mad at everybody" including White Rose because he lost his job with the company after 14 years of employment. In addition, Swanson did not remember anything that Georgopoulos or Skeries did to discourage him from asking the Union to arbitrate this matter. Further, Swanson would not have expected White Rose to communicate directly with him with regard to this situation.

Jerold E. Glassman, is an equity and managing partner in the law firm of Grotta, Glassman & Hoffman, the attorneys for White Rose. On July 23, 1997, Glassman signed the Settlement Agreement on behalf of White Rose, as its labor counsel. After the execution of this Agreement, the proposed escrow agent declined to undertake the administrative burden of distributing the money.

Thereafter, the Amendment was entered into. On January 3, 1993, Glassman signed the Amendment, as attorney, on behalf of White Rose; Georgopoulos signed on behalf of Local 138. The Amendment was drafted by Jed L. Marcus, one of Glassman's associates. With regard to the Amendment, Glassman testified that all of the provisions of the original Settlement Agreement remained intact and in place, except that the settlement sum "shall be reduced by the amount of such [employer] contributions." However, Glassman stated that, despite the fact that the Settlement Agreement provided for ratification by the Union membership, the Amendment did not require ratification. Glassman explained why, in his opinion, the Amendment did not have to be ratified:

A The original agreement which was subject to the ratification of the membership, all four corners of that agree-

ment, the substantive part of that agreement were not changed in the supplemental agreement. And it was made clear in the introductionary (sic) paragraph, and in that paragraph that you reported to, that the only supplement to the agreement was how the money would be distributed. The substance of the agreement was not changed whatsoever. And it is a practice in our field that you don't reratify, or you don't have to ratify an agreement that has been already ratified.

Q   What field are you discussing?

A Labor law.

Q   Were you familiar with the ratification provision in the union's by-laws?

A No.

Q   Isn't it a fact that the ratification in the original settlement agreement was put in there because of the ratification provision in the by-laws?

A   I have no idea.

Q   You have no idea?

A   It is a practice in our industry with respect to this particular kind of agreement that we put into the agreement that it is subject to the ratification of the membership, so we recognize it was ratified, that the union wanted it ratified. As a matter of fact, I wanted it ratified because of the circumstances existing at the time this agreement was negotiated.

Q   So, it is your position since the original agreement was ratified the amendment had not had to be ratified?

A   Absolutely.

.   .   .   .   .

The supplemental agreement did not change one iota. All the company was expending was $1,500,000.

Tr. at 106–07, 109.

■   The Court disagrees with this premise by Glassman. The Amendment radically changed the subject matter of the Settlement Agreement, namely, the amount of money the Union members would receive. The Amendment reduced that amount by the sum of $193,109.91, and, according to the Bylaws, this substantial reduction would require ratification by the members. The defendant's theory that even under the terms of the original Settlement Agreement the escrow agent would have deducted this amount, is misplaced. It is not readily apparent what deduction, if any, the escrow agent would have made. However, with reasonable certainty, before making such deductions, the escrow agent would have given notice to the Union members. More importantly, the Settlement Agreement did not provide for such deductions by the employer. By its terms, White Rose had to pay $1,500,-000 *net.* To reduce that amount by almost 13 percent would require ratification by the Union membership.

When he signed the Amendment, Glassman knew that the employees' share would be reduced by the employer's "share for all federal, state and local payroll taxes and F.I.C.A." He conceded that there is no such provision in the original Settlement Agreement. Not surprisingly, considering the result, when Glassman signed the Amendment there was no suggestion made that someone tell the "rank and file" that their share of the settlement funds would be reduced by more than $193,000.

■   The original Settlement Agreement unequivocally stated that White Rose "*shall* deposit the total sum of 1.5 million dollars, with the escrow agent, which sum shall be distributed to the aforementioned employees in accordance with the instructions given to it by the President of Local 138" (emphasis added). In addition, the Agreement provided that this money shall be distributed only if the Local 138 members do not engage in picketing and acts of violence against White Rose. The Settlement Agreement also states, "[T]hese amounts have been escrowed and *shall be disbursed* in accordance with the terms of paragraphs 1 and 2 herein" (emphasis added). The Settlement Agreement was si-

lent about deducting the employer's share of taxes from the sum to be paid.

THE COURT: Mr. Glassman, in the original agreement, Plaintiff's Exhibit 1, was there any mention of the company's contribution share for taxes to be deducted from the 1.5 million?

THE WITNESS: It wasn't the company's obligation at that point. We were only writing the check to the escrow agent.

THE COURT: I didn't ask you that question. And I move to strike and I do strike your entire answer as not responsive.

My question to you is: In the original agreement, Plaintiff's Exhibit 1, was there any mention that the 1.5 million would be reduced by the company's contribution share for taxes?

THE WITNESS: No, no mention whatsoever.

THE COURT: Was it agreed upon at that time?

THE WITNESS: It wasn't in issue at that time.

THE COURT: Not mentioned?

THE WITNESS: Not mentioned.

Tr. at 116–17.

The Court also notes Glassman's testimony that "all four corners of that agreement (the Settlement Agreement), the substantive part of that agreement were not changed in the supplemental agreement." It appears to the Court that if all other provisions of the Settlement Agreement were to remain intact, paragraph 14 which provided for ratification by "the rank and file members," was not effected by the Amendment. Thus, the Amendment, by its own terms, did not dispense with the need for rank and file ratification as set forth in the Settlement Agreement.

In the final phase of the plaintiffs' case, by stipulation, four exhibits annexed to an affidavit by George Conklin, Vice President of White Rose, were admitted in evidence (Plfs. Exs. 11, 12, 13 and 14). These exhibits set forth the amount of deductions made by White Rose from the settlement sum of $1,500,000, as follows:

| | |
|---|---|
| FUTA | 10,455.13 |
| SUI | 82,677.67 |
| FICA | 99,977.11 |
| Total Deductions: | $193,109.91 |

## B. *The Defendant's Case*

Richard Neff was the sole witness presented by the defendant. He is the Executive Vice President, Chief Financial Officer and a Director of the DiGiorgio Corporation. He related the violent history of the Local 138—White Rose strike. In this strike, White Rose incurred a security expense in excess of six million dollars, with total damages of more than ten million dollars. In sum, Neff testified that White Rose allocated only the sum of $1,500,000 for the settlement, and no additional money.

The defendant also offered an additional document in support of its defense. Defendant's Exhibit S, is a transcript of the argument of a motion before the Court on February 24, 1995, in which Leonard N. Flamm, attorney for the plaintiffs, made statements at pages 3 and 4. At that argument, Flamm explained to the Court why Local 138 was not joined as a defendant in this hybrid case. Flamm stated that "the union was a bit player" and "the role the union played was not sufficiently central to the bi-product result of this arbitration that we wanted to take a full DFR case against them." The Court notes that this statement by plaintiffs' counsel was made in response to the Court's inquiry as to why Local 138 was not initially joined as a party defendant. It was clearly not intended to exculpate Local 138 with respect to a violation of the duty of fair representation.

## IV.  DISCUSSION AND CONCLUSIONS

### A. *Duty of Fair Representation Claim*

It is well established that a union has a duty to represent fairly all union members

in its negotiations with the employer. *Spellacy v. Airline Pilots Ass'n–Int'l*, 156 F.3d 120, 126 (2d Cir.1998) (citing *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 74, 111 S.Ct. 1127, 1134, 113 L.Ed.2d 51 [1991] ). This duty is "implied under the scheme of the National Labor Relations Act." *White*, 128 F.3d at 113. In the seminal case of *DelCostello v. International Brotherhood of Teamsters, supra*, the Supreme Court explained the basis for the duty of fair representation, as follows:

> The duty of fair representation exists because it is the policy of the National Labor Relations Act to allow a single labor organization to represent collectively the interests of all employees within a unit, thereby depriving individuals in the unit of the ability to bargain individually or to select a minority union as their representative. In such a system, if individual employees are not to be deprived of all effective means of protecting their own interests, it must be the duty of the representative organization to "serve the interests of all members without hostility or discrimination toward any, *to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.*"

*DelCostello*, 462 U.S. at 164 n. 14, 103 S.Ct. at 2290 n. 14 (quoting *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 909–10, 17 L.Ed.2d 842 [1967] ) (emphasis added).

■ To prevail on a claim for a breach of the duty of fair representation, by the rule as promulgated by the Supreme Court, in the *Vaca–Hines* test, "Two elements must be proven for a breach of duty of fair representation claim: The union's conduct must, first, have been 'arbitrary, discriminatory or in bad faith,' ... and second, it must have 'seriously undermine[d] the arbitral process.' *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567 96 S.Ct. 1048, 1057–58, 47 L.Ed.2d 231 (1976)"; *Barr v. United Parcel Service*, 868 F.2d 36, 43 (2d Cir.1989) *see also Sim v. New York Mailer's Union No. 6*, 166 F.3d 465, 472 (2d Cir.1999); *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1152 (2d Cir. 1994).

■ Negligence or "tactical errors" on the part of the union are insufficient to establish a breach of the duty of fair representation. *Barr*, 868 F.2d at 43–44. In addition, "as long as the union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage." *Cook v. Pan American World Airways, Inc.*, 771 F.2d 635, 645 (2d Cir.1985), *cert. denied*, 474 U.S. 1109, 106 S.Ct. 895, 88 L.Ed.2d 929, (1986) (quoting *Capobianco v. Brink's Inc.*, 543 F.Supp. 971 975 n. 3 [E.D.N.Y. 1982] ). "It is well established that while 'a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion', an employee does not have an absolute right to have his or her grievance taken to arbitration." *Vaca*, 386 U.S. at 191, 87 S.Ct. at 917. "The Supreme Court has long recognized that unions must retain wide discretion to act in what they perceive to be their members' best interests." *Peterson v. Kennedy*, 771 F.2d 1244, 1253 (9th Cir.1985); *see also Ford Motor Co. v. Huffman*, 345 U.S. 330, 337–38, 73 S.Ct. 681, 685–86, 97 L.Ed. 1048, (1953).

The rule as to "fair representation" was clearly stated recently by the Second Circuit in *Sim v. New York Mailer's Union Number 6*, 166 F.3d at 472 (2d Cir.1999):

> A union breaches its duty of fair representation if its actions "can fairly be characterized as so far outside a wide range of reasonableness ... that [they are] wholly arbitrary, discriminatory, or in bad faith." *Spellacy*, 156 F.3d at 126 (alterations in original) (quoting *O'Neill*, 499 U.S. at 67, 111 S.Ct. 1127). Bad faith requires a showing of fraudulent deceitful, or dishonest action. *See Mock v. T,G, & Y. Stores Co.*, 971 F.2d 522, 531 (10th Cir.1992).

■ The Court agrees with witness Swanson and finds that the Local 138 lead-

ership violated their own Bylaws by entering into the Amendment and reducing the payments to the Union members. The Court finds that Georgopoulos and Skeries intentionally concealed this unauthorized action from the Union members. The Court further finds that these actions on the part of the Local 138 leadership constituted conduct in bad faith which undermined the entire transaction between the Union members and White Rose.

Bad faith is defined in Black's Law Dictionary Sixth Edition as: "The opposite of 'good faith,' generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Term 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will."

■ In the context of a breach of the duty of fair representation, bad faith requires a showing of fraudulent, deceitful or dishonest action *see Sim,* 166 F.3d at 472, or, when the union acts with an improper intent, purpose or motive, *See Mock v. T.G. & Y. Stores Co.,* 971 F.2d 522, 531 (10th Cir.1992); or other intentionally misleading conduct. *See e.g. Baxter v. United Paperworkers Int'l Union, Local 7370,* 140 F.3d 745, 747 (8th Cir.1998). The Court finds that the actions of the Local 138 leaders by entering into the Amendment without ratification, or notice to the Union members, or an opportunity to be heard, constituted bad faith.

■ A "union's actions are arbitrary, only if, in light of the factual and legal landscape at the time of the union's behavior is so far outside a 'wide range of reasonableness' . . . as to be intentional," *Air*

*Line Pilots Ass'n v. O'Neill,* 499 U.S. at 67, 111 S.Ct. at 1130 (1991) (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 [1953] ). Also, arbitrary conduct may consist of intentional omissions: "arbitrary conduct amounting to a breach is not limited to intentional conduct by union officials but may include acts of omission which, while not calculated to harm union members, 'may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary.' " *NLRB v. Local 282 Int'l Brotherhood of Teamsters,* 740 F.2d 141, 147 (2d Cir.1984) (quoting *Robesky v. Qantas Empire Airways, Ltd.,* 573 F.2d 1082, 1090 [9th Cir.1978] ).

In *Cruz v. Local Union Number 3 of the International Brotherhood of Electrical Workers,* 34 F.3d 1148 (2d Cir.1994), the Second Circuit affirmed a verdict in favor of the union members, whose complaints about non-seniority layoffs were ignored by union officials. In this case, the union officials' conduct was far more egregious—consisting of affirmative acts of disloyalty, covered up by deceitful behavior.

■ Citing *Kozera v. Westchester–Fairfield,* 909 F.2d 48, 54 (2d Cir.1990), White Rose raises the issue of its reliance on the apparent authority of the Union officers. In *Kozera,* the Second Circuit stated that even though the agreement at issue had not been ratified by the membership, "we conclude that, notwithstanding the issue of the duty of fair representation and disclosure owed by the Local Union's president and manager to the membership, the Chapter could reasonably believe that officers of the Local Union had authority pursuant to the arbitration award to bind the union membership." In view of the collusive actions by White Rose and the Union, the Court is unpersuaded by this argument. Also, the Court is of the view that, given the contractual requirement for prior ratification by the Union members of the Settlement Agreement, White Rose and its counsel should have known that the

Amendment to the same agreement, which markedly reduced the money paid to the members, required similar action.

In *Lewis v. Whelan, et al.*, 99 F.3d 542 (2d Cir.1996), the employer and the union concealed the terms of a modification of a collective bargaining agreement. In *Lewis*, as in the instant case, the employer also claimed that it was protected from ignoring the original contract provision because it reasonably relied, in good faith, on the union president's apparent authority to enter into the modification. The District Court, affirmed by the Second Circuit, rejected the employer's contentions and held that since the employer and Union together never revealed the existence of a contract modification but, in fact, concealed it from the union's rank and file, this was evidence of tortious intent. Because the employer actively participated with the union president in concealing the modification, the court held that the employer could not rely on the president's apparent authority to act for the union. 99 F.3d 542 at 544. The employer and the union were found to be jointly and severally liable for the contract violation and the union was held to have engaged in a breach of the duty of fair representation.

This concealment activity, present in *Lewis* and in this case, precludes the use of the doctrine of apparent authority by White Rose. *See Kozera, supra.* Because White Rose was a party to the concealment, its argument that it reasonably believed the President of Local 138 had apparent authority to enter into the Amendment, is unpersuasive. Also, White Rose's efforts to exculpate itself by obtaining a "release" letter from the Union Vice President (Plfs.Ex. 4) is equally unavailing.

In its post-trial brief, White Rose also argues that the Union failed to exhaust its administrative remedies as set forth in the Collective Bargaining Agreement. The Supreme Court has stated that:

courts have discretion to decide whether to require exhaustion of internal union procedures. In exercising this discretion, at least three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim. *If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust.*

*Clayton v. International Union, United Automobile Workers*, 451 U.S. 679, 689, 101 S.Ct. 2088, 2095, 68 L.Ed.2d 538 (1981) (citing in *NLRB v. Marine Workers*, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 [1968]) (emphasis added). The Court is of the view that it would have been futile for the plaintiffs to have requested Local 138 to arbitrate the validity of the Amendment to the Settlement Agreement. The Union President signed the Amendment and the Vice President confirmed it by letter. In fact, Robert Skeries, the Vice President of Local 138 indicated in the letter dated August 23, 1993 (Plfs.Ex. 4) that "it is the position of Local No. 138 that the Settlement Agreement and amendment thereto were concluded in compliance with the Union's By-Laws and are binding on Local 138 and all former White Rose employees who were represented by Local 138."

Based upon the alleged belief of the Local 138 hierarchy that the amendment to the Settlement Agreement was proper without the members ratification, with reasonable certainty, it would have been futile for the union members to seek internal arbitration. *See Clayton v. International Union United Automobile Workers*, 451 U.S. at 689, 101 S.Ct. at 2095 (declining "to impose a universal exhaustion requirement

lest employees with meritorious § 301 claims be forced to exhaust themselves and their resources by submitting their claims to potentially lengthy internal union procedures that may not be adequate to redress their underlying grievances."). Therefore, in this case, the Court finds that the members were not required to pursue internal grievance procedures or arbitration before bringing this lawsuit.

In this case, the Court finds that the acts and conduct of President Georgopoulos and Vice President Skeries in surreptitiously entering into this Agreement to reduce the union members share of the agreed Settlement amount, by the sum of $193,109.91 was not only arbitrary but deceitful, and "seriously undermined the arbitral process." In addition, the Court finds that Local 138 acted arbitrarily and in bad faith when it failed to challenge the settlement fund deduction when actually made.

White Rose points to Section 8.02 of the Bylaws as the authority of the Executive Committee of Local 138, which includes President Georgopoulos and Vice President Skeries, to enter into the Amendment without the requirement of membership ratification. The Court sees nothing in that section giving the President and Vice President of the Union the authority to enter into a contract which deprived its members of $193,109.91 of its monies, without ratification by or even notice to the members.

Having reviewed the evidence in this case, the Court finds that the plaintiffs proved, by a preponderance of the credible evidence, that the actions of the President and Vice President of Local 138 were arbitrary, deceitful and dishonest. These Union officials knowingly and deliberately entered into the Amendment, which reduced the Local 138 members' share of the settlement by the sum of $193,109.91 from the $1,500,000 agreed upon in the original Settlement Agreement, without the knowledge or consent of the member beneficiaries. Not only did the Union offi-

cials intentionally decline to submit this significant document for ratification by the members, they wilfully failed to advise the members of this major change, when they had the opportunity to do so the day following the execution of the Amendment.

Finally, the Court finds that the plaintiffs established, by a preponderance of the credible evidence,that there was a direct casual connection between the Union's unlawful conduct and the loss of the $193,-109.91 wrongfully deducted from the agreed settlement sum. *See e.g., Ackley v. Western Conf. of Teamsters,* 958 F.2d 1463, 1472 (9th Cir.1992); *Williams v. Romano Bros. Beverage Co.,* 939 F.2d 505, 508 (7th Cir.1991); *cf. Spellacy v. Airline Pilots Ass'n–Intl.,* 156 F.3d 120 (2d Cir. 1998).

Accordingly, judgment is granted in favor of the plaintiffs against the defendant White Rose in the sum of $193,109.91 together with the prejudgment interest from September 23, 1993.

### B. *As to Attorneys' Fees*

■ The general rule is that each party should pay their own legal fees, regardless of the outcome of the lawsuit, unless authorized by statutory or contractual provision; *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 254–57, 95 S.Ct. 1612, 1620–21, 44 L.Ed.2d 141, (1975); *Sierra Club v. United States Army Corps of Engineers,* 776 F.2d 383, 390 (2d Cir.1985) *cert. denied,* 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986).

■ In an action by union members against their union under the statute involved in this case, attorney's fees may be awarded. As stated in *Cruz v. Local Union No. 3, supra* at 1159;

This Court has held that a union member, in a suit against the union brought pursuant to the Labor–Management Reporting and Disclosure Act of 1959, ... need not recover compensatory damages from the union in order to be entitled to a fee award. *Rosario v.*

*Amalgamated Ladies' Garment Cutters' Union,* 749 F.2d 1000, 1007 (2d Cir. 1984). The *Rosario* court explained that awarding attorneys fees in such cases is valid because the liability verdict recognized the "deprivation of the plaintiffs' due process rights" by the union, and thus was "of benefit to the union and its membership regardless of the amount of provable damage to the plaintiffs." *Id. This principle is certainly appropriate in duty of fair representation suits, since it is apt to encourage unions to more zealously represent employees' interest. See Hall v. Cole,* 412 U.S. 1, 8, 93 S.Ct. 1943, 1948, 36 L.Ed.2d 702 (1973) (attorneys fees appropriate where the lawsuit vindicated valuable rights of union membership, and will improve union responsibility).

(Emphasis added) *see also Lewis v. Whelan,* 99 F.3d 542, 545 (2d Cir.1996).

Accordingly, in this case, the Court awards reasonable attorneys' fees to the prevailing plaintiffs. The attorneys for the plaintiffs are directed to serve and file an affidavit and corroborative documents in support of their request for attorneys' fees on or before November 8, 1999. The attorneys for the defendant may serve opposing papers on or before November 22, 1999. The plaintiffs' attorneys may serve a reply, if desired, on or before November 29, 1999. This matter is set down for oral argument and decision, if possible, on December 10, 1999 at 10:30 a.m.

**SO ORDERED.**