**Stanley WHITE, Ulysses Brown, and Donald W. Swanson, individually and on behalf of all other persons similarly situated, Plaintiffs–Appellees–Cross–Appellants,**

v.

**WHITE ROSE FOOD, a division of DiGiorgio Corporation, Defendant–Appellant–Cross–Appellee.**

No. 00–7232.

United States Court of Appeals, Second Circuit.

Argued Oct. 4, 2000.

Decided Jan. 10, 2001.

---

Leonard N. Flamm (Norman Mednick, Eden M. Mauro, Jill Schwartz, Law Offices of Leonard N. Flamm, on the brief), New York, New York for Plaintiffs-Appellees-Cross-Appellants.

Jedd Mendelson (Grotta, Glassman & Hoffman, P.A.) New York, New York for Defendant-Appellant-Cross-Appellee.

Before: KEARSE, CALABRESI, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge:

Defendant White Rose Food ("White Rose") appeals from a judgment entered following a bench trial in the United States District Court for the Eastern District of New York (Arthur D. Spatt, *Judge*), awarding plaintiffs Stanley White, Ulysses Brown, and Donald W. Swanson, individually and on behalf of all other persons similarly situated ("plaintiffs") $193,109.91 (plus prejudgment interest from September 23, 1993) and reasonable attorneys' fees, upon findings (i) that White Rose violated Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 (1994), by breaching a settlement agreement it had with plaintiffs' union, and (ii) that plaintiffs' union breached its duty of fair representation ("DFR") by entering into an amendment to the settlement agreement with White Rose. *White v. White Rose Food*, 72 F.Supp.2d 126 (E.D.N.Y.1999). Plaintiffs cross-appeal from a judgment granting them only $151,611.00 of their requested $436,396.00 in attorneys' fees. *White v. White Rose Food*, 86 F.Supp.2d 77 (E.D.N.Y.2000). We have jurisdiction pursuant to 28 U.S.C. § 1291 (1994).

White Rose claims, *inter alia*, that the district court erred in finding that the union leadership breached its duty of fair representation. Finding this claim persuasive, we reverse the district court's judgment.

## BACKGROUND

Because the facts of this case have been extensively recounted in three published opinions of the district court, *White Rose Food*, 72 F.Supp.2d 126; *White v. White Rose Food*, 62 F.Supp.2d 878 (E.D.N.Y. 1999); *White v. White Rose Food*, 930 F.Supp. 814 (E.D.N.Y.1996), as well as in a prior opinion of this Court, *White v. White Rose Food*, 128 F.3d 110 (2d Cir.1997), the following account is limited to facts that bear upon the issues which are the subject of the present opinion.

Plaintiffs were employed by White Rose at its Farmingdale, New York grocery warehouse and were members of the Furniture, Flour, Grocery, Teamsters, Chauffeurs & Warehousemen Union, Local No. 138 ("Local 138"). Local 138 went on strike against White Rose on February 1, 1991. On July 7, 1991, White Rose closed the Farmingdale warehouse and laid off all of the employees represented by Local 138. In July 1992, Local

138 and White Rose negotiated an agreement (the "Settlement Agreement" or "Agreement") to resolve their ongoing labor dispute. The Settlement Agreement provided that White Rose would place the sum of $1.5 million (the "Settlement Fund") in an escrow account to be distributed to eligible former employees of the Farmingdale facility.[1] The Settlement Agreement contained a binding arbitration clause and expressly stated that the Agreement required ratification by the eligible rank-and-file members of Local 138 who were former employees of White Rose. White Rose executed the Settlement Agreement on July 23, 1992, and the Local 138 membership ratified it on September 21, 1992.

In January 1993, the entity that was to serve as escrow agent and distributor of the Settlement Fund, Joint Council 16 (a division of Local 138's national union), informed Local 138 and White Rose that it would not serve in that capacity. Shortly thereafter, on January 23, 1993, Local 138 and White Rose entered into an "Amendment to Settlement Agreement" ("the Amendment"), which provided that White Rose—rather than Joint Council 16—would distribute the settlement funds to the former employees. More importantly for the purposes of this appeal, the Amendment further provided:

> This amendment shall not increase the cost of the Settlement Agreement to White Rose under any circumstances; [White Rose] shall not be required to spend more than [$1.5 million], *inclusive* of all employment tax liability. . . .
>
> . . . .
>
> [White Rose's] contribution share for all federal, state and local payroll taxes, and F.I.C.A., shall be *included* in the [$1.5 million Settlement] [F]und[ ] estab-

lished in the Settlement Agreement. Accordingly, the [S]ettlement [F]und[ ] established by the Settlement Agreement which may go directly to former White Rose employees *shall be reduced by the amount of such contributions.*

The original Agreement, in contrast, was silent on the issue whether such payroll taxes could be drawn from the Settlement Fund, and who was to pay those taxes. The Amendment neither contained a ratification clause nor was presented to the rank and file for ratification.

Plaintiffs commenced this action on August 2, 1993 in New York Supreme Court, Kings County, naming White Rose as the sole defendant, and alleging that White Rose breached the Agreement by (i) entering into the Amendment without securing rank-and-file ratification thereof, and (ii) deducting payroll taxes from the Settlement Fund. On October 19, 1993, White Rose removed the case to the United States District Court for the Eastern District of New York on the basis of federal question jurisdiction under Section 301 of the LMRA, 29 U.S.C. § 185. The district court ultimately granted (without prejudice) White Rose's motion for summary judgment on the grounds that plaintiffs "could only proceed against White Rose for a breach of the [A]greement under § 301 of the LMRA" via the mechanism of a so-called "hybrid [§ 301/DFR] suit," and that plaintiffs had failed to adequately plead an essential element of such type of suit, namely, that the union had breached its duty of fair representation. *White Rose Food,* 930 F.Supp. at 818. Plaintiffs then filed a third amended complaint adding Local 138 as a defendant, and alleging, *inter alia,* that the union had breached its duty of fair representation by entering into

---

1. Specifically, Paragraph 7 of the Agreement provides in relevant part:

   Fund Amounts: Immediately at the conclusion of the one hundred twenty (120) day period set forth in Paragraph 1, [White Rose] shall deposit one million dollars ($1,000,000) in an escrow account naming Joint Council 16 [a division of Local 138's national union] as Escrow Agent. One hundred twenty days thereafter, [White Rose] shall deposit an additional five hundred thousand dollars ($500,000) in the said escrow account.

the Amendment without presenting it to the rank and file for approval.

On July 8, 1996, the district court again granted summary judgment in favor of White Rose and Local 138 as to all claims. *Id.* at 814. On appeal, this Court affirmed the district court's dismissal of plaintiffs' claims against Local 138, agreeing that they were time-barred. *White Rose Food,* 128 F.3d at 114–15. However, we reversed the district court's dismissal of plaintiffs' hybrid § 301/DFR claim against White Rose, reasoning that "[t]he fact that the plaintiffs are time-barred from bringing a claim against the union does not mean that the plaintiffs cannot prove that Local 138 breached its duty of fair representation in an action against White Rose." *Id.* at 116 (internal quotation marks omitted).

On remand, White Rose again moved for summary judgment as to all claims. On July 12, 1999, the district court denied White Rose's motion for summary judgment as to the hybrid § 301/DFR claim, but granted it as to all other claims. *White Rose Food,* 62 F.Supp.2d 878. A bench trial followed on August 12 and 16, 1999. In a subsequent Memorandum and Order dated October 28, 1999, the district court found that, by entering into the Amendment, White Rose breached the Agreement and the union leadership breached its duty of fair representation, and accordingly granted judgment in favor of plaintiffs in the sum of $193,109.91. *White Rose Food,* 72 F.Supp.2d 126. On February 7, 2000, the district court awarded plaintiffs attorneys' fees in the amount of $151,611.00. *White Rose Food,* 86 F.Supp.2d 77.

On March 1, 2000, White Rose filed a timely notice of appeal. On March 7, 2000, plaintiffs filed a timely cross-appeal, challenging the district court's award of attorneys' fees in an amount significantly less than had been requested.

## DISCUSSION

### I. Standard of Review

██ In reviewing a district court's decision in a bench trial, we review the district court's findings of fact for clear error and its conclusions of law *de novo.* See *United States v. Coppola,* 85 F.3d 1015, 1019 (2d Cir.1996). Mixed questions of law and fact are likewise reviewed *de novo.* See *Scribner v. Summers,* 84 F.3d 554, 557 (2d Cir.1996).[2] Under the clearly erroneous standard, "there is a strong presumption in favor of a trial court's findings of fact if supported by substantial evidence. We will not upset a factual finding unless we are left with the definite and firm conviction that a mistake has been committed." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1574 (2d Cir.1994) (internal citations and quotation marks omitted).

### II. Elements of a Hybrid § 301/DFR Claim

██ To establish a hybrid § 301/DFR claim, a plaintiff must prove both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-a-vis the union members. See *DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 164–65, 103 S.Ct. 2281, 76 L.Ed.2d 476

---

2. Although there appears to be some dispute as to whether a finding that the union's conduct breached its duty of fair representation resolves a question of fact or a mixed question of law and fact, *compare Galindo v. Stoody Co.,* 793 F.2d 1502, 1513 (9th Cir.1986) (mixed question) *with Buford v. Runyon,* 160 F.3d 1199, 1201 (8th Cir.1998) (question of fact); *Dushaw v. Roadway Express, Inc.,* 66 F.3d 129, 132 (6th Cir.1995) (same), this Circuit has assumed without explicitly deciding

that it is a question of fact, *see Lewis v. Whelan,* 99 F.3d 542, 544 (2d Cir.1996); *Lewis v. Tuscan Dairy Farms, Inc.,* 25 F.3d 1138, 1142–43 (2d Cir.1994); *Steinman v. Spector Freight Sys., Inc.,* 476 F.2d 437, 439 (2d Cir. 1973); *Simberlund v. Long Island R.R. Co.,* 421 F.2d 1219, 1227 (2d Cir.1970). Because we conclude that the district court's findings are erroneous under either standard, we need not resolve this issue here.

(1983). The plaintiff may sue the union or the employer, or both, but must allege violations on the part of both. *See id.* at 165, 103 S.Ct. 2281.[3]

A claim for breach of the duty of fair representation consists of two elements. First, "a union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Marquez v. Screen Actors Guild, Inc.,* 525 U.S. 33, 44, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998) (citing *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *see also Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991)). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." *Id.* (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953)). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez,* 525 U.S. at 45–46, 119 S.Ct. 292. "A settlement is not irrational [and thus arbitrary] simply because it turns out *in retrospect* to have been a bad settlement." *O'Neill,* 499 U.S. at 79, 111 S.Ct. 1127. A showing of "[b]ad faith requires a showing of fraudulent, deceitful, or dishonest action." *Sim v. New York Mailers' Union No. 6,* 166 F.3d 465, 472 (2d Cir.1999); *see also Spellacy v. Airline Pilots Ass'n–Int'l,* 156 F.3d 120, 126 (2d Cir.1998) ("Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct.").

Second, if plaintiffs establish the first element of a DFR claim, they must then also prove that there was "a causal connection between the union's wrongful conduct and their injuries." *Spellacy,* 156 F.3d at 126.

## III. The District Court's Decision

The linchpin of the district court's finding that White Rose breached the Agreement and that the union leadership breached its duty of fair representation was its conclusion that the Settlement Agreement *"[b]y its terms"* provided that the $1.5 million Settlement Fund was *"net"*—rather than *inclusive*—of the $193,000 in payroll taxes that would be owed on that amount. *White Rose Food,* 72 F.Supp.2d at 133 (emphasis added). The district court inferred that, because the Amendment provided that the $1.5 million was inclusive of the $193,000 in payroll taxes, the Amendment effected a $193,000 reduction of the amount to which the members were entitled under the Agreement. *Id.* at 138. This conclusion then served as the primary basis for the district court's further findings (i) that the leadership's handling of the Amendment was arbitrary and in bad faith;[4] (ii) that this arbitrary and bad faith conduct caused plaintiffs' injury, namely, the $193,000 reduction of the Settlement Fund, *id.;* and (iii) that White Rose breached the Agreement by entering into the Amendment.[5]

**3.** Section 301 of the LMRA governs the employer's duty to honor the collective bargaining agreement, and the duty of fair representation is implied from § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a). *See DelCostello,* at 164, 103 S.Ct. 2281; *Price v. International Union, United Auto. Aerospace & Agric. Implement Workers,* 795 F.2d 1128, 1134 (2d Cir.1986).

**4.** The district court reasoned that the undisputed failure of the leadership to secure the members' ratification of the Amendment, and to provide them with notice and an opportunity to be heard, when viewed in light of the Amendment's monetary significance, justified an inference that the leadership "intentionally concealed [the Amendment] from the Union members." *White Rose Food,* 72 F.Supp.2d at 136; *see also id.* at 133, 138.

**5.** White Rose argued that its execution of the Amendment did not constitute a breach of the Agreement because it had reasonably relied on the leadership's authority to bind Local 138 to the Amendment. The district court rejected this argument, reasoning that, "given the contractual requirement for prior ratification by the Union members of the Settlement Agreement, White Rose and its counsel should

■ Given the centrality of the district court's interpretation of the Agreement as providing for a fund that was "net" of payroll taxes to its ultimate determination that plaintiffs established their hybrid § 301/DFR claim, we begin our review of this determination with a review of this interpretation—a review that we conduct *de novo. See Tourangeau v. Uniroyal, Inc.,* 101 F.3d 300, 307 (2d Cir.1996) ("We review a district court's interpretation of a settlement agreement *de novo* ....") (citing *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir.1995)).

■ The district court correctly observed that the Agreement does not explicitly address the key question of whether the $1.5 million Settlement Fund was to be net or inclusive of the $193,000 in payroll taxes.[6] *White Rose Food,* 72 F.Supp.2d at 133–34 ("The Settlement Agreement was silent about deducting the employer's share of taxes from the sum to be paid."). Despite this finding, however, the district court concluded that, *"[b]y [the Agreement's] terms,* White Rose had to pay $1,500,000 *net." Id.* at 133 (emphasis added). We hold as a matter of law that this conclusion was erroneous. The Agreement is silent on the "net vs. inclusive" issue; at most, it is ambiguous on this issue. As regards the Agreement's silence on this issue, we note that it would have been futile for the district court to have implied a term or clause to the Agreement to fill this gap. *See* Restatement (Second) of Contracts § 204 (1979). Because a determination of whether a union breached its duty of fair representation focuses on the factual and legal climate existing at the time the union acted, any term or clause the district court implied to the Agreement in 2001 could not have influenced the leadership's decision to negotiate and execute the Amendment in January 1993. As regards the Agreement's ambiguity on the "net vs. inclusive" issue, we note that the district court cannot be faulted for failing to resolve this ambiguity in their favor by considering extrinsic evidence. *See Olin Corp. v. Insurance Co. of North Am.,* 221 F.3d 307, 318 (2d Cir.2000). Because plaintiffs chose to argue that the Agreement unambiguously provides that the Settlement Fund is net of payroll taxes, they did not present any extrinsic evidence relevant to resolving such ambiguity. *Cf. Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 232 F.3d 153, 158 (2nd Cir.2000) ("A court may ... grant summary judgment regarding the interpretation of ambiguous language if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language.").

As we will explain, without the support provided by this linchpin—the district court's erroneous conclusion that the Agreement unambiguously provided that the Settlement Fund was "net" of payroll taxes—the court's determination that the leadership breached its duty of fair representation was clearly erroneous.

## IV. The Hybrid § 301/DFR Claim

■ With respect to the DFR branch of plaintiffs' hybrid § 301/DFR claim, the district court concluded that the union leadership's conduct regarding the Amendment was both arbitrary and in bad faith.[7] We disagree.

### A. Arbitrary Conduct

As noted, in determining whether a union's conduct was "so far outside a wide range of reasonableness as to be irrational," *O'Neil,* 499 U.S. at 67, 111 S.Ct. 1127

have known that the Amendment to the same agreement, *which markedly reduced the money paid to the members,* required similar action." *White Rose Food,* 72 F.Supp.2d at 136–37 (emphasis added).

6. Specifically, Paragraph 7 of the Agreement provides merely that White Rose is to place $1.5 million in an escrow account.

7. Plaintiffs did not allege that the leadership's actions were discriminatory.

(internal citation and quotation marks omitted), we "evaluat[e] the rationality of a union's decision in light of both the facts and the legal climate that confronted the negotiators at the time the decision was made," *id.* at 78, 111 S.Ct. 1127. Plaintiffs thus had the burden at trial of establishing that the leadership's decision to negotiate and execute the Amendment, under the factual and legal circumstances existing at that time, was irrational. Their attempt to satisfy this burden was limited to the contention that the Agreement unambiguously provided that the Settlement fund was net of payroll taxes. Because—as explained in the preceding section—this contention is erroneous, it follows that plaintiffs failed to present any evidence from which a reasonable trier of fact could conclude that the leadership's decision to negotiate and execute the Amendment was arbitrary.

Indeed, the evidence presented at trial that was relevant to the issue of the rationality of the leadership's decision supports the opposite conclusion—that the leadership's decision to negotiate and execute the Amendment was rational. White Rose's lead negotiator testified at trial that a Joint Counsel 16 official told him that Joint Counsel 16 withdrew as escrow agent because it "did not want to undertake the administrative burden required by the escrow agent." [8] As this statement suggests, administration of the Settlement Fund was not a cost-free enterprise. Hence, assuming that the union leadership had been able to secure a replacement escrow agent, the cost of the administration of the escrow account would have to have been borne in some manner, either by the union or from the escrow account. Plaintiffs, however, presented no evidence that showed that such costs would have been

significantly less than the $193,000 in payroll taxes that was deducted from the Settlement Fund as a result of the Amendment, such that the leadership's decision to enter into the Amendment rather than secure a replacement escrow agent was irrational.

Furthermore, citing relevant case law, White Rose has argued that, under the Agreement, the escrow agent—as opposed to White Rose—was responsible for payroll taxes on the Settlement Fund. *See STA of Baltimore–ILA Container Royalty Fund v. United States*, 621 F.Supp. 1567, 1575 (D.Md.1985), *aff'd*, 804 F.2d 296 (4th Cir.1986) (holding that the escrow agent of a settlement fund may be considered the "employer" for tax purposes). Although plaintiffs dispute this position—just as they dispute White Rose's position on the issue whether the Settlement Fund was net or inclusive of payroll taxes—plaintiffs failed to present evidence that showed that the leadership acted irrationally in entering into the Amendment with White Rose instead of pursuing arbitration [9] or litigation on these issues. Plaintiffs presented no evidence at trial that tended to show that the leadership believed or should have believed that an arbitrator would unquestionably find that the Settlement Fund was net of payroll taxes, nor, assuming that the arbitrator determined that the Settlement Fund was net of payroll taxes, that he or she would go on to find that White Rose— as opposed to the escrow agent—was responsible for the payroll taxes. If the arbitrator would have found that the Settlement Fund was inclusive of payroll taxes, the members would have received the same amount of money that they received pursuant to the Amendment. And even if the arbitrator would have found that the

---

8. Counsel for White Rose echoed this explanation of Joint Counsel 16's withdrawal at oral argument, stating that Local Counsel 16 withdrew because "it was highly impractical for them to administer th[e] fund. They thought that [White Rose] already had the systems set up with all the employees tax IDs, etc."

9. Paragraph 12 of the Agreement provides: "All disputes regarding the interpretation and/or implementation of this Settlement Agreement shall be resolved in final and binding arbitration utilizing the arbitration procedure of the New York State Board of Mediation."

Settlement Fund was net of payroll taxes, if the arbitrator had then found that the escrow agent—as opposed to White Rose—was responsible for the payroll taxes, the leadership likely would have been able to secure a replacement escrow agent only by agreeing to the very sort of amendment they in fact negotiated and executed with White Rose. In view of these significant risks, it was not unreasonable for the leadership to choose the safer course of entering directly into the Amendment with White Rose.

Moreover, even assuming *arguendo* that it was more likely than not that an arbitrator would find in the union's favor on the "net vs. inclusive" issue and on the issue of whether the escrow agent or White Rose was to be responsible for payment of the payroll taxes, the leadership could have reasonably determined that immediate distribution of a somewhat reduced fund was to be preferred to distribution of the entire $1.5 million after months or even years of costly arbitration or litigation. In other words, on this record, no reasonable trier of fact could conclude that the leadership acted irrationally by negotiating an amendment that "produced certain and prompt access to a share of the [Settlement Fund] and avoided the costs and risks associated with major [arbitration and/or] litigation.... In labor disputes, as in other kinds of litigation, even a bad settlement may be more advantageous in the long run than a good lawsuit." *O'Neill*, 499 U.S. at 81, 111 S.Ct. 1127.

In sum, there is no question that, under the factual and legal circumstances existing at the time, the leadership's decision to negotiate and execute the Amendment fell well within "the wide range of reasonableness" afforded unions by *O'Neill*. Hence, in concluding that the leadership's negotiation and execution of the Amendment was arbitrary, the district court clearly erred.

## B. Bad Faith

The district court found that the leadership acted in bad faith by (i) not seeking member ratification of the Amendment, and (ii) not providing the members with notice and an opportunity to be heard regarding the Amendment. *White Rose Food*, 72 F.Supp.2d at 133, 136.

■ As an initial matter, we note that the union leadership was not under a duty to submit the Amendment for member ratification. Federal labor law does not require rank-and-file ratification of employer-union agreements. *See International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., Local No. 310 v. NLRB*, 587 F.2d 1176, 1182 (D.C.Cir.1978) ("The [National Labor Relations] Act does not require a union to accord its rank-and-file members the right to ratify a collective-bargaining contract which it has negotiated."); *Deboles v. Trans World Airlines, Inc.*, 552 F.2d 1005, 1018 (3d Cir.1977). Such ratification is required only if the union's constitution or by-laws or the agreement itself so provides. *See Confederated Indep. Unions, Local No. 1 v. Rockwell-Standard Co.*, 465 F.2d 1137, 1140 (3d Cir.1972).

■ Contrary to the finding of the district court, *White Rose Food*, 72 F.Supp.2d at 132, Section 15.05 of Local 138's Constitution and Bylaws did not require ratification of the original Agreement. Section 15.05 provides in relevant part merely that "[c]ontract ratification and strike authorization shall be made at meetings called specifically for those purposes and shall [minimally] include ... members covered by the contract." This language does not state that all contracts must be ratified, let alone that all contract amendments must be ratified. Rather, the provision merely specifies the type of meeting that is required for ratification of contracts that require ratification.[10] And

---

**10.** Moreover, because this interpretation of Section 15.05 was arguably the leadership's interpretation, the district court would have been obliged to adopt it unless it found that this interpretation was patently unreasonable. *See Sim*, 166 F.3d at 470 (holding that courts

although Paragraph 14 of the Agreement explicitly provided that the Agreement required "the ratification of the rank and file members of Local No. 138," the Amendment contained no such ratification provision.[11] Finally, White Rose presented undisputed testimony at trial that the parties to the Amendment never discussed whether the Amendment would be ratified. In all the circumstances, the leadership's failure to seek rank-and-file ratification of the Amendment did not constitute bad faith.

The district court's further finding that the leadership acted in bad faith by failing to provide the members with notice and an opportunity to be heard regarding the Amendment was also unsupported by substantial evidence in the record. Having found (i) that the leadership acted reasonably in negotiating and executing the Amendment, and (ii) that the leadership had no duty to seek rank-and-file ratification of the Amendment, we are strongly disinclined to view the leadership's failure to provide such notice and opportunity to be heard as evidence of the leadership's intent to deceive or defraud the members. To be sure, where a union has a duty to secure rank-and-file ratification of an agreement, the union also has a duty to explain the agreement to the rank and file. See Farmer v. ARA Servs., Inc., 660 F.2d 1096, 1103–04 (6th Cir.1981). Where, as here, such a ratification requirement is lacking, however, the union has no duty to inform the members of the agreement. Hence, in such circumstances, the mere failure to provide notice and an opportunity to be heard regarding the agreement, without more, does not amount to bad faith. No such additional evidence of an intent to deceive or defraud is present in the record. On the contrary, as explained in the preceding subsection, the evidence at trial indicates that the leadership acted in the members' best interest by negotiating and executing the Amendment. In short, there is no evidentiary support for the district court's conclusion that the leadership acted in bad faith by failing to give the members notice and an opportunity to be heard on the Amendment.

Having determined that the leadership's conduct regarding the Amendment was neither arbitrary nor in bad faith, we hold that the leadership did not breach its duty of fair representation.[12] Moreover, because proof of a hybrid § 301/DFR claim requires proof of violations by both the union and the employer, see DelCostello, 462 U.S. at 165, 103 S.Ct. 2281, plaintiffs' failure to establish their DFR claim against the union means that their hybrid § 301/DFR claim against White Rose necessarily fails as well.[13]

## V. Attorneys' Fees

In view of the preceding conclusion that plaintiffs failed to prove their hybrid

---

in this circuit are to "defer to the Union's interpretation of its governing documents unless that interpretation is patently unreasonable") (citation and internal quotations omitted).

11. Citing testimony by the lead negotiator of the Amendment on behalf of White Rose that "all four corners of [the Agreement], the substantive part of [the Agreement] were not changed in [the Amendment]," the district court reasoned that "if all other provisions of the Settlement Agreement were to remain intact, paragraph 14 which provided for ratification by 'the rank and file members,' was not affected by the Amendment. Thus, the Amendment, by its own terms, did not dispense with the need for rank and file ratifica-

tion as set forth in the Settlement Agreement." White Rose Food, 72 F.Supp.2d at 134. This reasoning is unpersuasive. Paragraph 14 of the Agreement refers to the Agreement itself, not to amendments to the Agreement; and, as noted, the Amendment itself contains no such ratification clause.

12. Having thus concluded that plaintiffs failed to establish the first element of a DFR claim, we need not reach the issue whether they established the second element, that the leadership's arbitrary or bad faith conduct caused their alleged injury.

13. Accordingly, we need not reach the issue whether plaintiffs established their Section 301 claim.

§ 301/DFR claim, plaintiffs are not "prevailing parties" in this case; consequently, they are not entitled to attorneys' fees in any amount. *See Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1159 (2d Cir.1994); *cf. Pino v. Locascio,* 101 F.3d 235, 237 (2d Cir.1996) ("Determining whether an award of attorneys' fees is appropriate requires a two-step inquiry. First, the party must be a 'prevailing party' in order to recover.") (quoting *Farrar v. Hobby,* 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)). Thus, we do not reach plaintiffs' argument on cross-appeal that the district court erred by reducing their requested attorneys' fees award from $436,396.00 to $151,611.00.

## CONCLUSION

For the reasons set forth above, we reverse the district court's judgment awarding plaintiffs $193,109.91 in damages and reasonable attorneys' fees, and remand with instructions for the district court to enter judgment in favor of White Rose.