Thomas **BALESTRACCI**

v.

**GENERAL DYNAMICS CORP.**

No. 3:00CV599 (JBA).

United States District Court,
D. Connecticut.

June 3, 2002.

Jeffrey M. Sklarz, Zeisler & Zeisler, P.C., Bridgeport, CT, Thomas F. Moukawsher, Moukawsher & Walsh, Groton, CT, for plaintiff.

Stacie A. Boeniger, Nixon Peabody, Hartford, CT, for defendant.

## MEMORANDUM OF DECISION
### [# 69, 74]

ARTERTON, District Judge.

Plaintiff Thomas Balestracci was laid off before and recalled after an employee with less seniority in violation of the collective bargaining agreement ("CBA") between his employer, General Dynamics Corporation ("GD"), and his union, the Metal Trades Council ("MTC"). Although plaintiff was recalled as soon as the error was brought to his Local's attention, and MTC then grieved the erroneous lay-off, the grievance was denied as untimely under two earlier arbitration decisions holding that MTC has constructive knowledge of errors in seniority lists at the time the erroneous list is provided by GD—here, in 1974. Plaintiff sued GD, alleging a violation of the CBA and a breach of MTC's duty of fair representation by failing to ensure the accuracy of the seniority lists provided by GD, in violation of the Labor Management Relations Act ("LMRA"), § 301, 29 U.S.C. § 185.

### I. Procedural history

The Court previously ruled on cross-motions for summary judgment that because defendant had failed to provide any evidence that the MTC had taken any steps to verify the accuracy of the seniority lists following the arbitration decisions, plaintiff was entitled to summary judgment because the MTC's unexplained failure to act was quintessentially arbitrary conduct, and thus a breach of the duty of fair representation. Defendant sought reconsideration, arguing that it was unaware that the Court had granted plaintiff's belated motion to amend his complaint to allege this liability theory, and thus had no opportunity to address plaintiff's new allegations or conduct discovery on them.[1]

---

1. Apparently, neither side ever received a copy of the Court's order granting the motion to amend from the Clerk's Office. It was not

The Court granted the motion, finding that reconsideration was warranted because manifest injustice would result to defendant absent an opportunity to be heard on the motion and to conduct limited discovery, and stayed the ruling. The parties have now completed that discovery. Defendant has again moved for summary judgment and plaintiff has submitted a supplemental memorandum in support of his original motion for summary judgment.

## II. Factual background

Balestracci was hired as a "burner" by the Electric Boat division of GD on September 9, 1974. As a burner, plaintiff was a member of the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, Local 614 ("Boilermakers" or "Local"). Martin Sior was hired as an electronics mechanic on August 26, 1974, and at that time was a member of the International Brotherhood of Electrical Workers, Local 261. On October 13, 1974, when Sior transferred into the burner position, he became a member of the Boilermakers and was trained by plaintiff.

Pursuant to the 1972–1975 Collective Bargaining Agreement ("CBA"), plaintiff's seniority date for purposes of layoff and recall was his hire date, September 9, 1974. Because Sior was represented by a different local prior to the transfer to the burner position, his seniority date for purposes of layoff and recall should have been his transfer date, October 13, 1974. However, the seniority lists prepared by GD erroneously listed Sior's seniority date as August 26, 1974, the date of his original hire.

The 1972–75 CBA required GD to provide MTC with seniority lists each January and July.[2] In January 1975, GD first distributed to MTC a burner seniority list erroneously listing Sior as senior to Balestracci to MTC. The error was not discovered or corrected, and GD continued to distribute copies of the erroneous list to MTC twice a year without anyone identifying the error.

In 1979, in an arbitration between GD and MTC involving an error in the maintenance painters' seniority list that had resulted in an erroneous layoff similar to the one at issue here, the arbitrator found that MTC and the Painter's Local (which had received copies of the seniority lists for its members from MTC) "had constructive knowledge of the error since it had seniority rosters going back to 1974 [when the first erroneous list was distributed] that incorrectly showed" one employee as junior to the other.[3] The arbitrator also noted that "the Union failure to discover the erroneous layoff cannot be attributed to anything the Company did or did not do in late 1977." In reaching this conclusion, the arbitrator relied in part on the fact that MTC had discovered that a number of other employees were incorrectly laid off in time to allow the necessary remedial action by GD, and that the MTC had not been prevented by GD from ascertaining the correct information. The arbitrator therefore concluded that MTC's failure to bring the grievance within twenty days of the incident giving rise to the grievance precluded MTC from grieving it approximately fifteen months later when it obtained actual knowledge of the error.[4]

until preparing for a status conference that the parties discovered that the Court had ruled on the motion in plaintiff's favor.

**2.** MTC receives one seniority list from Electric Boat; that list is divided by seniority groupings, generally by occupational title.

See Aff. of Linda Gastiger, ¶ 3 [Doc. # 76, Ex. A].

**3.** *In re Arbitration Between GD and MTC*, MTC 3987A–9, at 4 [Pl.Ex. L, Doc. # 34].

**4.** *Id.*

There is no evidence in the record that MTC took any steps to ensure the accuracy of the seniority lists before 1983, when a second arbitration decision, also involving MTC and GD, again held that MTC had constructive knowledge of errors in seniority lists at the time it receives the lists from GD, and thus a grievance based on an erroneous layoff that resulted from the lists was time barred, even though filed immediately after MTC had actual knowledge of the error.[5] In reaching this conclusion, the arbitrator specifically noted:

> There is no question in my mind that the 'bargained for' Seniority lists were timely received by the Union—at least twice a year—during the entire time period under review. It was and is the Union's responsibility to check these lists upon receipt for accuracy and completeness and to immediately resolve discrepancies with management either through discussions or the timely use of the grievance procedure—or both. How the Union accomplishes the 'checking task' is primarily an internal Union matter, but periodic reviews (by posting or otherwise) with all bargaining unit members may be a reasonable first step in the quality check of the rosters. Obviously, management must cooperate (as the record indicates they have in the past) by making relevant source documents and record cards available to the Union in these reviews. I am under no illusions that this periodic review of the Seniority Rosters by the Union is either an easy or costless task. To the contrary. However, the Union certainly did not bargain for these lists to be developed, maintained and received simply to file away and later purge, without an accuracy check. They required these lists to assist in fulfilling

one of their primary functions, i.e., the administration of several sections of the Collective Agreement where seniority controls the rights of bargaining unit employees under a myriad of circumstances.[6]

After this decision was issued, the president of MTC, Tom Kiddy, wrote an article about it for the August 1983 issue of "Labor's Views," the MTC newsletter. In that article, Kiddy stated that the decision was important for members to be aware of, as it impacted their seniority rights, and noted that "I am very concerned about the seniority rights of our members and I don't want to see anyone improperly laid off or promoted. The Union has a difficult task to check the seniority dates of each member and verify the accuracy of each, but I intend to meet the challenge."[7] Kiddy continued:

> As I understand it, the Union's responsibility consists of 3 parts: the M.T.C., the Local Unions, and the members. Each must do its share to get the job done. The M.T.C. is responsible to assure that the seniority tab runs we receive are accurate. I have written to the Manager of Labor Relations requiring assistance from his department so we can compare the dates of the July 1983 Seniority Roster (not yet received) with the master cards and other source documents. The M.T.C. will also file a grievance to contest the accuracy of that Roster to protect the Union against a claim of untimeliness while we are checking. In the meantime the Local Unions are responsible to make the seniority tab runs available to all members and to report any errors to the M.T.C. It has been strongly advised by the company and the Arbitrator that these lists be

---

5. *In re Arbitration Between GD and MTC,* Grievance No. E–23–82 [Pl.Ex. C].

6. *Id.* at 8–9.

7. Pl.Ex. D.

posted in the workplace. This is not always practical. It is also suggested that Stewards have a copy of the Roster in their possession, but not all Stewards of a respective Local need have them if more than one is assigned to a geographical area. Each Local Union will be responsible to make them available as it thinks best. Seniority Rosters are provided to the M.T.C. in January and July of every year of the contract. It is the responsibility of every member of the M.T.C. bargaining unit to check their seniority date twice a year and verify its accuracy. Each member must monitor their ranking relative to other employees and report any errors to their Steward. You should also check to assure that reported errors have been eliminated from the next Roster provided by the Company. If the error is repeated again, report it directly to the M.T.C.[8]

Kiddy ultimately determined that manually verifying the accuracy of the seniority dates of the approximately 12,000 members of the MTC against the master cards was unworkable.[9] Instead, he decided to provide copies of the seniority lists to the

Local unions when they were given to MTC by GD, and stressed to the Locals the importance of verifying the accuracy of the lists during union meetings.[10] When DelaCruz took over as president of MTC in 1991, he continued to provide copies of the seniority lists to the Locals and to encourage the Locals to provide access to the lists to the Local members.[11] Kiddy and DelaCruz believed that the individual members were the best source of information as to the accuracy of seniority because members had a direct financial interest in the accuracy of the lists. Consistent with Kiddy and DelaCruz's testimony, John James, the Boilermakers' president from 1987 to 1998, also stated that MTC "repeatedly requested that each local union, including the Boilermakers, urge all members to review the seniority lists and immediately report any errors to the MTC. This frequently came up at MTC and Boilermakers union meetings."[12]

The Boilermakers Local decided that posting the lists was not a viable option, as the lists contained social security numbers and were frequently torn down.[13] Instead, stewards were given copies of the seniority lists to keep in their lockers at work, and

---

**8.** *Id.* While it is undisputed that "Labor's Views" is widely distributed, none of the witnesses recalled whether they had seen this article by Kiddy at any time in 1983, and plaintiff had never seen the article. However, both Gilbert Lavoie (the Boilermakers chief steward from 1980 to 1986) and Kenneth DelaCruz (the Boilermakers business manager and steward from 1986 through the present) were aware of the 1983 arbitration decision. *See* Lavoie Aff. ¶ 4; DelaCruz Dep. at 48.

**9.** Kiddy Aff. ¶ 8.

**10.** *Id.* at ¶ 11 ("I told the local unions to use their discretion in how they distributed the lists, but I suggested that where possible, the lists should be posted and/or given to their stewards for distribution and member review.").

**11.** DelaCruz Dep. at 33. DelaCruz became aware of the 1983 arbitration decision during his tenure as president of MTC, probably when he went "through all the old arbitration cases trying to educate [himself] on some past practice and arbitration cases." *Id.* at 48. This decision was the reason that MTC "placed great emphasis on making sure that all the Locals in January and July made sure that [the seniority dates] were correct." *Id.* While DelaCruz met with the heads of each Local and reminded them to ensure the accuracy of the dates, "they all knew that anyway ... [because] [t]heir predecessors did it, and it was a carryover of procedure to when they came to go through them." *Id.* at 49–50.

**12.** James Aff. ¶ 6.

**13.** *See* James Aff. at ¶ 7; Adamson Dep. at 21–23.

were instructed to make the lists available to members.[14] The stewards also encouraged members to review the lists, although it is undisputed that no one ever told plaintiff to review the list.[15]

GD was required to provide sixty days notice before a layoff.[16] During that period, many members asked to see their seniority lists and errors were occasionally identified.[17] When a union member brought a possible error to President James's attention, he went back to the master records and would also verify the seniority dates of other members on that list.[18] James did not check the master

---

**14.** Gilbert Lavoie, chief steward from 1980 to 1986, stated that after learning of the arbitration decisions in the 1980s:

> I understood that all local Unions had a responsibility to help ensure accurate seniority lists. During my time as Chief Steward, there were approximately 5,000 members of the Boilermakers. In order to fulfil this responsibility, I designated a steward in each distinct geographical region of the shipyard and on each shift to act as "seniority representative." Approximately 10–12 seniority representatives were each given a copy of the complete Boilermaker seniority lists (tab run) every six months and instructed to post or otherwise make the list available to employees in their geographic regions within the shipyard. The release of a new seniority list always generated a lot of interest on the part of the members.

Lavoie Aff. ¶ 6; *see also* DelaCruz Dep. at 27–28 (as a steward, DelaCruz had a copy of the lists in his locker); Adamson Dep. at 23 (same); Anderson Dep. at 33–35 (same).

**15.** *Compare* DelaCruz Dep. at 92 (As a Boilermakers steward in the 1980s, DelaCruz "routinely told people to check the list."); Adamson Dep. at 71 (Adamson recalls telling "scores of members on the lists."); Lavoie Aff. ¶ 8 ("Employees were encouraged to verify the accuracy of the seniority list for their occupational title.... Because most employment decisions were (and are) based on employee seniority dates, most employees were quite diligent in reviewing, questioning and commenting on the seniority rosters, particularly during times of shift transfers, promotions and layoffs. We definitely relied on employee information in revising and correcting the lists."); James Aff. ¶ 7 (" The stewards announced the fact that they received a new list and encouraged employees to review it."), *with* Balestracci Supp. Aff. ¶ 9 (plaintiff was never told by any union official to check the seniority lists).

**16.** *See* DelaCruz Dep. at 52–53.

**17.** *See* DelaCruz Dep. at 53 (while serving as steward, DelaCruz noticed an increase in member interest in the seniority lists because "if you did find mistakes, it could mean that you would remain employed"); *id.* at 124 ("Once there were layoffs, you were the most sought out individual [as steward] ... you were hunted down."); Lavoie Aff. ¶ 9 (the Local "expected that members would use [the sixty day] notice period to confirm that their layoffs were appropriate. Indeed, many employees did raise questions at this time and, occasionally, errors were discovered."); Adamson Dep. at 33, 24 (Employees approached Adamson during layoffs to verify their seniority ... and the "stewards definitely make it known when the time came that the layoffs started. Right before the layoffs, the members knew, because you would see them running to a steward right and left. I go in the shipyard myself and always carry a list, especially at the time of the layoffs. You couldn't go too far without people flocking around."); *id.* at 61 ("[W]e had a lot of stewards. Stewards were down there equipped with the seniority lists. The seniority lists were in the tool room and in the wire room. We encouraged people to look into their seniority. And I mean you couldn't walk, in those early '90s, through that 260 building, thirty, fifty feet, without seeing someone huddled around with the steward looking at the seniority list. Everyone knew the notices were coming out.").

**18.** *See* James Aff. ¶ 9 ("At the time of certain events, such as promotions, shift changes, layoffs and recalls, the number of inquiries regarding seniority lists would increase. Occasionally I would confirm the seniority date of a selected employee with master records located at EB. Sometimes I would also compare the seniority dates of other employees adjacent on the list with the master records to make sure that the most senior person was receiving the appropriate treatment.").

records unless a possible error was brought to his attention, however.[19]

In 1997, GD determined that it would be forced to lay off employees in its Electric Boat division, including several burners. All affected burners were given sixty days notice of the impending layoff.[20] This list had been used for three other layoffs without complaint and thus James did not check the burner list against the master records.[21] Balestracci did not request a copy of the list from the stewards at this time.[22] He was laid off pursuant to the erroneous seniority list on August 14, 1997, while Sior was laid off on March 27, 1998. When GD initiated recalls in 1999, Sior was recalled on July 6, 1999.

When Sior was recalled in July, fellow union member Jeannette Santoro remembered that Balestracci had trained Sior in the 1970s, contacted Balestracci to ask him whether Sior was junior to him, and advised him that Sior was back at work. Balestracci told Santoro that Sior was less senior than he was, and Santoro informed John Adamson, the president of the Boilermakers, that there might be a problem with Sior's seniority. Adamson contacted Sior, learned that Sior had previously been employed as an electrician, reviewed the historical records with a GD industrial relations department employee, and then discovered the error in Sior's seniority date calculation.

GD then sent a recall letter to Gerald Ruple, who was senior to both Sior and Balestracci. When Ruple did not respond, GD recalled plaintiff on September 15, 1999. MTC initiated a grievance to recover back pay and lost benefits owed for the 42 weeks in which plaintiff was erroneously laid off. The grievance was denied by GD as untimely based on the 1979 Arbitration Decision, which held that " '[t]ime limits for [grieving an issue] begin to run whenever the Union has knowledge of the incident, or where it would have had this knowledge, if it had acted with reasonable care and diligence.' "[23] In light of that decision, MTC refused to pursue the grievance to arbitration, and withdrew the grievance without prejudice. Plaintiff then filed this LMRA § 301 suit against GD, alleging that he was not barred by the failure to exhaust the union grievance procedures because MTC had breached its duty of fair representation by failing to ensure the accuracy of the list.

### III. Standard of review

A court shall grant a motion for summary judgment under Fed.R.Civ.P. 56 "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Silver v. City Univ.*, 947 F.2d 1021, 1022 (2d Cir. 1991). The moving party bears the initial burden of establishing that no genuine issue of material fact exists and that the undisputed facts show that she is entitled to judgment as a matter of law. *See Rodriguez v. City of New York*, 72 F.3d 1051, 1060 (2d Cir.1995).

Once this initial burden has been met, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogato-

19. From 1983 to 1999, when the error in Sior's seniority date was identified, no errors resulting in erroneous layoffs or recalls have been identified, although, as discussed below, several errors were identified and corrected before any employment action was taken in reliance on the erroneous lists.

20. James Aff. ¶ 13.

21. *Id.*

22. Balestracci Supp. Dep. at 37, 49.

23. Pl. Local R. 9(c) Statement, ¶ 31.

ries, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir.2000).

On cross-motions for summary judgment "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993) (citing *Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305, 313 (2d Cir.1981)). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer*, 667 F.2d at 314.

## IV. Discussion

■ The parties agree that because plaintiff asserts a "hybrid" LMRA claim, plaintiff must demonstrate a breach of the CBA by General Dynamics as well as a breach of the duty of fair representation by his union in order to prevail on his LMRA, § 301 claim against GD. *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 163–65, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 101 S.Ct. 1559, 1564, 67 L.Ed.2d 732 (1981); *White v. White Rose Food*, 237 F.3d 174, 178 (2d Cir.2001).

■ "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *accord Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 74, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991); *Spellacy v. Airline Pilots Association–International*, 156 F.3d 120, 126 (2d Cir.1998). Plaintiff maintains that MTC's failure to take sufficient steps to ensure the accuracy of the seniority lists it received from GD, given its duty to enforce the CBA and the consequences of the 1979 and 1983 Arbitration Decisions, was arbitrary.

■ "[T]he union's statutory duty of fair representation protects the individual employee from arbitrary abuses of the settlement device by providing him with recourse against both employer (in a § 301 suit) and union ...." *Vaca*, 386 U.S. at 193, 87 S.Ct. 903. Union conduct is arbitrary *"only if*, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside the range of reasonableness as to be irrational." *Air Line Pilots*, 499 U.S. at 67, 111 S.Ct. 1127 (internal quotations and citations omitted) (emphasis added). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45–46, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998) (*quoting Air Line Pilots*, 499 U.S. at 78, 111 S.Ct. 1127). However, "arbitrary conduct amounting to a breach is not limited to intentional conduct by union officials but may include acts of omission which, while not calculated to harm union members, may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." *National Labor Relations Bd. v. Local 282, IBT*, 740 F.2d

141, 147 (2d Cir.1984) (citations and internal quotations omitted); *accord Cruz v. Local Union No. 3 of Int'l Bhd.*, 34 F.3d 1148, 1153 (2d Cir.1994).

"The doctrine of fair representation is an important check on the arbitrary exercise of union power, but it is a purposefully limited check, for a 'wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents.'" *United Steelworkers of America v. Rawson*, 495 U.S. 362, 374, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990) (*quoting Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953)). Thus, courts have consistently held that "mere negligence, even in the enforcement of a collective bargaining agreement, [does] not state a claim for breach of the duty of fair representation." *Id.* at 372–73. In recognition of the need for deference to union decision-making, "a determination of whether a union breached its duty of fair representation focuses on the factual and legal climate existing at the time the union acted." *White v. White Rose Food*, 237 F.3d 174, 180 (2d Cir.2001).

This Court previously granted summary judgment in plaintiff's favor upon an undisputed record showing that MTC did nothing to ensure the accuracy of the seniority lists prepared by GD and relied upon by GD in calculating seniority for lay offs and rehiring. In light of the arbitration decisions, which alerted MTC to the fact that there were some errors in the seniority lists prepared by GD and put MTC on

notice of the dire consequences to its members if it failed to identify errors in the list, the Court concluded that MTC's unexplained failure to act to take any steps to protect its members' interests was arbitrary. *See Ruzicka v. General Motors Corp.*, 649 F.2d 1207, 1212 (6th Cir.1981) (whether a union's conduct is arbitrary turns on whether "the union can articulate a sufficient legal rationale to justify the manner in which a grievance has been handled"); *cf. Vencl v. International Union of Operating Engineers*, 137 F.3d 420, 425 (6th Cir.1998) (untimely filing of grievance because business manager was on vacation is a breach of duty of fair representation because "only reasoned conduct, not irresponsible inattention" should be deemed non-arbitrary).

After the Court stayed its earlier ruling, additional discovery was conducted and the parties have again cross-moved for summary judgment. GD contends that the undisputed facts now demonstrate that MTC and the constituent local unions took steps to ensure the accuracy of the seniority lists, thus requiring a grant of summary judgment in its favor.[24] GD also argues that as plaintiff admitted that he saw a seniority list in the early 1990s that listed Sior above him, his failure to report the discrepancy, rather than any failing on the union's part, caused the erroneous layoff. Plaintiff, in turn, maintains that the steps taken by MTC and the Locals were inadequate, as they consisted primarily of impermissibly delegating the responsibility to ensure the accuracy of the lists to the union members themselves.[25]

---

**24.** The parties have now provided deposition testimony and affidavits from Kenneth Dela-Cruz, who has served as president of MTC since 1991 and business manager and steward of the Boilermakers Local since 1986, Gilbert Lavoie, chief steward of the Boilermakers from 1980 to 1986, John Adamson, chief steward of the Boilermakers since 1986, John James, president and steward of the

Boilermakers from 1987 to 1998, describing the practices within the Local relating to seniority lists, and Thomas Anderson, steward from 1986 to the present, vice president from 1996 to 1999, and president from 1999 through the present.

**25.** Plaintiff also asserts in passing that as it is undisputed that MTC did nothing from 1974

In determining whether the union's conduct was arbitrary, the Court's inquiry is limited to whether it was irrational or capricious, as no bad faith is claimed here. "As long as the union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage." *Barr v. United Parcel Serv., Inc.*, 868 F.2d 36, 43–44 (2d Cir.1989) (internal citations and quotations omitted). Plaintiff first argues that MTC's failure to review the master cards, after Kiddy identified this step as an effective way to identify errors in 1983, was arbitrary. However, Kiddy's affidavit states that he decided that reviewing the 12,000 members' dates by hand was impractical. Instead, relying on his understanding that individual members were best situated to alert the locals and MTC to any errors, MTC distributed the lists to the Local unions, with the instructions that the Locals were to distribute the lists and report any errors for immediate correction. Other union officers, including Boilermaker officers DelaCruz and James, concurred in the determination that members are the best resource for verifying the accuracy of the lists, and plaintiff has not offered any evidence suggesting that this belief was unreasonable. The Court also notes that this is precisely the methodology suggested in the 1983 arbitration decision: "How the Union accomplishes the 'checking task' is primarily an internal Union matter, but periodic reviews (by posting or otherwise) with all bargaining unit members may be a reasonable first step in the quality check of the rosters." Thus, as there is no evidence suggesting that Kiddy or DelaCruz or any other MTC official had reason to believe this approach was not functioning, the Court concludes that no rational factfinder could deem this decision to delegate responsibility to the Locals arbitrary or capricious.

Plaintiff next argues that even if MTC's determination to delegate responsibility to the Locals was rational, the Local's failure to post the lists or instruct members that they had the responsibility to review the lists for accuracy constituted a breach of its duty of fair representation. While plaintiff cites to the arbitration decision's suggestion that the lists be posted, it is undisputed that both the arbitrator and Kiddy suggested posting *or* some other effective means of making the lists available to members. In light of the concerns about member privacy and the use of social security numbers on the list, no factfinder could conclude that the Local's explanation for its determination that posting was not a viable solution was irrational. Moreover, plaintiff's argument ignores the evidence—in the form of testimony from former Local chief stewards, presidents and other officers—that the Boilermaker stewards had copies of the lists in their lockers and that members knew that they could request a copy of the lists from their stewards.[26] Accordingly, the Boilermaker's reliance on members to request the lists

---

when the error occurred to 1983 when the second decision came down, and Balestracci's grievance became stale in 1975 after GD got the list, the duty of fair representation was necessarily breached. However, MTC was not aware until 1979 that it would be deemed to have constructive notice from the date of the original error. Second, there is no evidence suggesting that Kiddy's expectation—echoed by the arbitrator's 1983 decision—that any errors reported to GD before an action was taken based on the erroneous list would promptly be corrected was erroneous, and the record demonstrates that when the Local did identify errors, GD corrected them. Finally, the Court disagrees with the characterization of any errors reported after the first list was distributed as "stale," as the lists were issued every six months, and presumably any grievance filed within 20 days of issuance of a new list would not be untimely.

26. While plaintiff states that he did not have a steward in 1997, Adamson explained that even if a member did not have a steward, "[w]e would have stewards all over the Yard.

from the stewards, based on the past practice in which members frequently asked to see the lists, particularly during layoffs, could not be found to be irrational. *Cf. NLRB v. Local 282, IBT*, 740 F.2d at 147 (union's reliance on oral announcement and word of mouth to ensure that members received notice of an adverse arbitration award which required members promptly to take action to protect their seniority interests was arbitrary when the union could not rationally have believed that the majority of members would receive the oral notice, and union therefore failed to protect members' interests).[27]

Plaintiff also argues that merely making the lists available was inadequate because the lists included only badge numbers and a member would not necessarily know whether a person with a lower badge number was in fact junior to him if, as occurred here, the other employee transferred from another Local. As an example, plaintiff notes that he saw a seniority list in 1992 that listed Sior as having more seniority but a lower badge number.[28] However, the Court finds the example of plaintiff and Sior more probative of the reasonableness of MTC and the Local's belief that individual members were the best source of information, given that although almost twenty-five years had passed since he trained Sior, not only did plaintiff immediately recognize there was an error after he

---

So there would be a steward available. We also advertise constantly that any member has the right to request a steward with their boss. The company has an obligation in a timely fashion to get them a steward." Adamson Dep. at 30–31. Stewards also wore buttons so that employees could identify them in the Yard. *Id.* at 16. Plaintiff does not contend that there were no stewards available in 1997 when he was laid off.

27. Plaintiff notes that when he asked a steward in 2002 for a copy of the list, the steward told him he did not have one, and had been asking for one for months. Balestracci Supp. Aff. at ¶ 11. This does not rebut the testimony from Adamson, Anderson and DelaCruz that during the time frame relevant here, 1983 to 1997, stewards were provided with copies of the seniority lists. In addition, plaintiff states that he spoke with Pat Casey, a steward from 1988 through 1996, who allegedly "stated that he was never told to distribute [the lists] or make copies of them. He said that basically he just left it in his locker." *Id.* at ¶ 13. Casey's alleged statement is also consistent with the other officials' testimony—there is no allegation by GD that the Boilermakers ever instructed the stewards to distribute or copy the lists.

28. Plaintiff explained that he did not know whether the list reflected Sior's transfer from a different unit as it included only badge numbers, but offers no explanation why he did not inquire in 1992 about a possible error in the lists. *See* Balestracci Supp. Dep. at 42–50. While plaintiff now attempts to create a disputed issue of fact by claiming in a supplemental affidavit that it was not until 1999 when Adamson investigated the master cards that plaintiff became aware of the error in Sior's seniority date, that contention is contradicted by his deposition testimony. In his supplemental deposition, Balestracci testified that he knew that Sior was less senior than he was from 1974 when Sior transferred to the burner position because "[h]e was working with me in the engine room and he had transferred over. Believe he was hired in here as an electrician mechanic or something. And he switched over to burner." Balestracci Supp. Dep. at 19–20. While plaintiff stated that he was unsure whether Sior's seniority date changed when the transfer occurred, he was clear that Sior had less seniority as a burner. *Id.* at 20. In addition, in his first affidavit, submitted in support of the original summary judgment motion, plaintiff stated that it was when he spoke with Ms. Santoro that he learned that Sior had been recalled before him, "even though he had less seniority, for purposes of layoffs and recalls." ¶ 20. Consistent with plaintiff's original testimony, Adamson described a phone call from Jeanette Santoro in which "[s]he said at that time, *Tommy* said that he was more senior than Marty Sior. So then she came to see me and asked me to call Tommy up and get into it, which I did." Adamson Dep. at 44–45 (emphasis added).

learned that Sior had been recalled before he was, but even Jeannette Santoro, plaintiff's co-worker, was aware of the possible error.

Next, while plaintiff argues that the Local stewards did not encourage members to review the lists, the only evidence cited in support of this contention is the fact that plaintiff himself was never told to review the lists and Anderson's testimony that the Local did not inform the members *in writing* that this was their duty.[29] GD, however, has provided testimony of four Boilermaker officer/stewards, all of whom claim to have encouraged members to review the seniority lists to assure their accuracy.[30] Moreover, many of these stewards also testified that members did contact them with questions about seniority, and several errors were identified. Similarly, plaintiff's failure to request an opportunity to review a copy of the seniority list when he received the notice of layoff in 1997 does not render irrational the Local's belief that members were actively engaged in ascertaining the accuracy of the lists, particularly as it is undisputed that errors were identified using this process. There is also undisputed testimony from multiple Boilermaker stewards during the 1980s through late 1990s that whenever a layoff was announced, many members sought to verify their seniority. Under these circumstances, no factfinder could find irrational the Local's belief that members were sufficiently aware of the importance of seniority and also of the availability of seniority lists such that no further steps needed to be taken.[31]

Finally, plaintiff argues that the MTC and the Local cannot delegate their responsibility to enforce the collective bargaining agreement to the general membership without subverting the entire collective bargaining process. Under the circumstances here, however, because errors were identified through this process and the *only* evidence of any erroneous layoff to have fallen through the cracks from 1983 through 1999 relates to Sior's seniority date, the error giving rise to this litigation, the Court finds that this delegation could not be found to be irrational or arbitrary. While plaintiff argues that MTC's procedures failed on "three notable occasions" (giving rise to the 1979 decision, the 1983 decision and this litigation), the fact that plaintiff is apparently the only MTC member to have suffered adverse consequences due to an error in the seniority lists since 1983 makes him something of a *sine qua non*, and certainly does not demonstrate arbitrariness in the MTC and Local's belief that their procedures, essentially adopting the suggestion of the arbitrator in 1983, were adequate.

While it is undisputed that had the Local actually checked all the master cards prior to plaintiff's layoff in 1997 the error would have been corrected, the duty of fair representation does not require that a union act perfectly. Instead, absent any allegation of bad faith, plaintiff may prevail only by demonstrating that MTC and the Local's belief that their system adequately protected members' interests was so flawed as to be arbitrary. In light of the testimony submitted by GD, plaintiff has failed to submit any evidence from which a

---

29. *See* Anderson Dep. at 89.

30. *See* Note 15, *supra*.

31. In addition, James' description of the process of checking the lists belies plaintiff's

claim that the Local did nothing, because he annotated the list during each year to be sure that transfers or other actions were properly reflected in the next list and thus went beyond simply checking one erroneous list with another.

reasonable factfinder could conclude that either MTC or the Local's responses to the arbitration decisions were so minimal or misguided as to be fairly characterized as arbitrary or capricious, and GD is entitled to summary judgment in its favor.

## IV. Conclusion

For the foregoing reasons, defendant's supplemental motion for summary judgment on Count One [# 69] is GRANTED. Plaintiff's supplemental cross-motion [# 74] is DENIED and the Ruling dated November 9, 2001 [# 57] is hereby VACATED.

IT IS SO ORDERED.